[Cite as *In re H.H.*, 2019-Ohio-4953.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In re: [H.H. et al.],                              :

                                        No. 19AP-158

                              :          (C.P.C. No. 18JU-13859)

[S.B., Mother,                                     :        (REGULAR CALENDAR)

        Appellant].                             :

---

D E C I S I O N

Rendered on December 3, 2019

---

**On brief:** *Robert J. McClaren*, for Franklin County Children
Services. **Argued:** *Robert J. McClaren*.

**On brief:** *Yeura R. Venters*, Public Defender, and *Ian J.
Jones*, for appellant. **Argued:** *Ian J. Jones*.

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

DORRIAN, J.

{¶ 1} Appellant, S.B. ("mother"), parent of H.H., C.H., T.H., and M.H. (collectively "the children"), appeals from the February 28, 2019 judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating the children to be dependent, terminating parental rights of mother and C.H., Sr. ("father"), the father of H.H. and C.H. and alleged father of T.H. and M.H., and granting permanent custody of the children to appellee, Franklin County Children Services ("FCCS"). For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} On November 30, 2018, FCCS filed a complaint asserting the children were dependent pursuant to R.C. 2151.04(C) and seeking permanent custody for purposes of

adoption.[1]  In the complaint, FCCS alleged H.H., C.H., and T.H. had been in the custody of FCCS for 35 months and M.H. had been in the custody of FCCS for 23 months.  On February 7, 2019, the children's guardian ad litem filed a report recommending the juvenile court grant FCCS permanent custody.  Beginning February 14, 2019, the juvenile court held a combined adjudicatory and dispositional hearing.

{¶ 3}    At the hearing, mother testified this case was originally opened because H.H. disclosed in February 2015 that she had been sexually abused by D.M., the father of mother's best friend, R.E.B., the children's maternal grandfather, and father.  When H.H. reported the abuse, mother, father, H.H., C.H., and T.H. were staying at R.E.B.'s residence. H.H., who was six years old at the time, was diagnosed with a sexually transmitted infection and father had the same sexually transmitted infection as H.H.  At the time, mother believed R.E.B. sexually abused H.H.  However, at the hearing, mother admitted it was possible father sexually abused H.H.

{¶ 4}    In April 2015, mother, father, H.H., C.H., and T.H. left R.E.B.'s residence and moved to a hotel for approximately three weeks.  In May 2015, mother was homeless and left H.H., C.H., and T.H. at paternal grandmother's residence for approximately two weeks. Thereafter, mother moved into a residence with father, H.H., C.H., T.H., and her sister.

{¶ 5}    In June 2015, mother missed an appointment to get T.H.'s immunization shots.  In July 2015, mother was unable to pay an electric bill in the amount of $1,800 and the electricity was terminated at her home.  There were roaches and rodents in mother's home.  H.H. had 32 absences from school during that year, half of which occurred during a period while mother was in jail.  Mother missed some of H.H.'s counseling appointments. Mother agreed she was "overwhelmed" after her period of homelessness.  (Feb. 14, 2019 Tr. at 19.)

{¶ 6}    On August 31, 2015, FCCS received custody of H.H., C.H., and T.H. because mother and father had not worked on their case plans.  On the same day, after FCCS removed H.H., C.H., and T.H., father hit mother while intoxicated and was charged with

---

[1] We note FCCS stated in its complaint that this was the second refiling of the complaint. FCCS alleged it received custody of H.H., C.H., and T.H. on August 31, 2015. On June 6, 2016, H.H., C.H., and T.H. were adjudicated dependent. FCCS further alleged that it received temporary custody of M.H. on August 24, 2016. On December 1, 2016, M.H. was adjudicated to be a neglected and dependent child. FCCS alleged  the court determined that due to failure of service on father, it requested the court vacate the original adjudications and refiled the case seeking permanent custody.

domestic violence. In September 2015, mother obtained a temporary protection order against father, but failed to appear at court. As a result, the protection order was dismissed.

{¶ 7} On October 26, 2015, father pled guilty to domestic violence and, as part of his sentence, was ordered to stay away from mother. Although father had been ordered to stay away from mother, they maintained regular contact with one another. Mother stated she conceived M.H. with father while father's criminal order to stay away was in effect.

{¶ 8} On March 24, 2016, police and an FCCS caseworker visited mother's residence and found father sleeping there. Mother denied father was living at her residence at the time. Mother claimed father would break into her residence, including kicking open her door and breaking her windows. Mother asserted she called police on father between 20 to 30 times, but police would not assist her.

{¶ 9} In June 2016, mother was aware the juvenile court had ordered father not to have any direct or indirect contact with the children. Mother admitted she would still talk to the children about father. In August 2016, father was in mother's home although she again denied he was living there. On August 16, 2016, father was present at the hospital for M.H.'s birth while the court's no-contact order was still in place. M.H. remained in mother's custody for two to three days after birth until FCCS removed her. M.H., who was two years old at the time of the hearing, had been in FCCS's continuous custody following her removal.

{¶ 10} Mother denied she was having regular contact with father in February 2017, although she admitted father was present when the guardian ad litem visited her residence at that time. In April 2017, father was arrested for assault outside mother's residence. Mother eventually moved to a different part of town to get away from father. Mother stated she would not allow maternal grandfather or father to have any contact with H.H.

{¶ 11} At the time of the hearing, mother was in a relationship with A.G., who was living with her along with his daughter. Mother received income from government benefits. Mother also worked for her landlord, but did not receive regular income for such work. Mother alleged her landlord did not provide her with a tax statement for her earnings, and asserted "I don't draw taxes." (Feb. 14, 2019 Tr. at 47.) Mother stated she was always able to pay her own bills and did not rely on A.G. for help. However, mother testified she relied on the National Youth Advocate Program ("NYAP"), an organization contracted by FCCS to

complete casework, for help to pay her $1,800 electric bill. Mother also testified asking NYAP for help with a December 2017 gas bill.

{¶ 12} Mother testified that, in December 2018, she provided H.H. with a ring which had the letter "E" engraved on it. Mother told H.H. that it came from H.H.'s grandfather. At the hearing, mother claimed the ring was from J.H., her stepfather. Mother denied the ring came from R.E.B., H.H.'s maternal grandfather.

{¶ 13} H.H. and C.H. each had an individualized education plan ("IEP"), but mother was unable to state the goals of either IEP. Mother was aware H.H. had challenges with reading and math, and was doing better with reading. However, mother was not able to specifically state what progress had been made. Mother had not spoken with C.H.'s teacher about any progress at school. Mother acknowledged the children's FCCS counselors had not agreed to let mother have family counseling with the children. Mother stated she was ready to resume having custody of the children and parent them on a regular basis.

{¶ 14} Sondra Cotton, family case manager and mentor to teens at NYAP, testified she was assigned to be the caseworker for this matter beginning December 17, 2017. According to Cotton, FCCS first opened its case with the family on August 31, 2015 due to alleged sexual abuse and concerns regarding domestic violence. FCCS removed H.H., C.H., and T.H. on August 31, 2015 and M.H. on August 24, 2016. FCCS received temporary custody of H.H., C.H., and T.H. on May 27, 2016 and M.H. on November 21, 2016. All children had been in the continuous custody of FCCS for over 22 months.

{¶ 15} According to Cotton, the juvenile court approved and adopted a case plan for the family when FCCS received temporary custody of the children. Mother's case plan required her to "[c]omplete parenting classes, follow recommendations; mental health assessment, follow recommendations; alcohol and other drug assessment, follow any recommendations; psychological, psychiatric assessment, follow any recommendations; protect family from domestic violence; learn about [domestic violence] cycle; recognize signs of harmful relationships; stable housing and income to be provided to [FCCS]; and to complete visitation with the children at [FCCS]." (Feb. 14, 2019 Tr. at 64-65.) Although Cotton agreed that mother had completed many case plan activities, she did not consider mother to have satisfied the requirements of the case plan.

{¶ 16} Cotton did not believe mother satisfied the parenting portion of her case plan. Although mother had participated in a parenting class, as required by her case plan, she continued to have issues managing the children and struggled to multitask during supervised visits with the children. During the weekly, two-hour-long visits, mother only periodically engaged with the children. Instead, mother became frustrated by the children's misbehavior and spent the visit providing the children with directives and yelling at the children. Mother also yelled at and was unable to control A.G.'s daughter, whom she brought to visits with the children. Unsupervised visits had not been approved as a result of concerns regarding mother's ability to monitor the children and ensure the children's safety. Additionally, staff supervising the visits had to provide ongoing redirection.

{¶ 17} Mother requested family counseling in January 2018, but Cotton met with resistance from mother when she attempted to set up counseling sessions. Family counseling was ended after two sessions because counselors felt it was inappropriate to continue due to the children's escalating behaviors after the sessions. The children also reported to their counselors they were reluctant to share their feelings because mother would be mad at them if they said how they felt. As of the hearing, the children's counselors had not given consent to resume family counseling sessions.

{¶ 18} Cotton testified regarding two recent concerns with mother's parenting. At a visit on January 22, 2019, mother spanked M.H., grabbed H.H. by the face to redirect her, and ordered excessive time-outs. H.H. appeared to be upset after mother grabbed her by the face, prompting Cotton to intervene and speak with mother.

{¶ 19} Cotton was also concerned about a ring mother provided to H.H., which had the letter "E" engraved on it. Mother told Cotton the ring was a birthday gift to H.H. from "a grandfather." (Feb. 14, 2019 Tr. at 70.) Mother told H.H. to wear the ring. After receiving the ring, H.H. started acting inappropriately at school and had issues at counseling and home related to the ring. Cotton expressed to mother that she was concerned because R.E.B., H.H.'s maternal grandfather, had reportedly sexually abused her and the letter engraved on the ring was the same as one of the initials in R.E.B.'s name. Cotton discussed with mother multiple times that she should not prompt traumatic memories for H.H. in a non-therapeutic manner. After speaking with mother about the ring and the January 22, 2019 visit, Cotton determined she needed to make additional referrals for parenting.

{¶ 20} Cotton did not believe mother successfully completed her case plan requirement to learn about the domestic violence cycle and how to recognize the signs of a harmful relationship. Mother continued to see father, including becoming pregnant with M.H., after he had been charged with domestic violence and mother had sought a protection order. On cross-examination, Cotton stated that, to her knowledge, mother was not in an abusive relationship at that time and was not in contact with father.

{¶ 21} Cotton did not agree that mother met her case plan requirement of providing a stable home because various individuals were observed to be staying there, frequently moving in and out of the residence. Mother admitted to Cotton that other individuals had stayed at the residence, but denied they were living there despite evidence they were sleeping in rooms that would have been occupied by the children. Mother's explanation of her relationship to the people moving in and out of the residence shifted over time, presenting a concern as to whether mother was providing accurate information to FCCS. Cotton was additionally concerned because of reported behavioral issues with some of the individuals staying at the residence. Cotton stated that "[t]he ongoing concerns of persons in the home, in and out of the home on a regular basis is very high risk for the children due to their specialized needs." (Feb. 14, 2019 Tr. at 92.) Therefore, Cotton did not believe the home was stable.

{¶ 22} Cotton testified that, throughout the history of the case, mother had not been able to establish stable income as required by her case plan. Although mother claimed she was employed, she also stated her employment was inconsistent and "under the table." (Feb. 14, 2019 Tr. at 81.) Mother did not provide any documentation to FCCS to support her claimed employment or income from government benefits. Mother struggled to pay for utilities and food, although she was able to do so with assistance.

{¶ 23} Father's case plan required him to take parenting classes, following all recommendations; complete a mental health and abuse of drugs assessment, following all recommendations; complete a psychological and psychiatric assessment, following all recommendations; protect the family from domestic violence; and, finally, to establish paternity for the children. Father had not participated in any portion of his case plan at the time of the hearing.

{¶ 24} H.H., C.H., and T.H. were together in a single foster to adopt home and M.H. was at a different foster home. All of the children were bonded to their respective foster parents. Cotton stated the children were also bonded with mother, but the contact between them "seem[ed] forced a lot of times with the children at the [] visits." (Feb. 14, 2019 Tr. at 90.) Cotton recommended permanent custody be granted to FCCS.

{¶ 25} Vicky Rush testified she was formerly a case manager for court appointed special advocates ("CASA") and served as acting lay guardian ad litem for the children from August 2015 until 2017. In August 2015, Rush visited mother's residence before H.H., C.H., and T.H. were removed by FCCS. At that time, there was no electricity at the residence; mother stated electricity would be back on in two weeks. There were exposed boards in the ceiling where it had collapsed. The house was messy and dirty. There was broken glass in the yard. Rush recommended that H.H., C.H., and T.H. be removed from the residence at the hearing in August 2015. At the time, Rush's main concerns were the safety issues in the home; the sexual abuse of H.H., including that the identity of the perpetrator was unclear; and H.H. had not been attending school.

{¶ 26} After the children were removed, Rush continued to have concerns with mother and father because of the lack of clarity on the perpetrator of the sexual abuse of H.H. and because of mother and father's ongoing relationship after father committed domestic violence. Rush found father at the residence in both February 2016 and February 2017 when she made unannounced visits to the residence. Mother told Rush she was not going to keep the children away from father. Father was at the residence after mother had finished domestic violence classes. Rush believed mother was unwilling to put the safety of the children ahead of her relationship with father. Additionally, Rush was concerned because mother had difficulty maintaining a safe, clean home environment. There were cockroaches at the residence and a broken window that was a safety concern.

{¶ 27} Mother had been instructed by her caseworker to not have other individuals living at her home, but Rush found several individuals staying there, including in the children's bedrooms. Rush was concerned because she did not know with certainty the identity of the individuals who were staying at mother's home and because the sexual assault of H.H. made the children vulnerable. Rush worried about the protection and safety of the children if these individuals were sleeping in the same room as them. Rush found it

especially concerning that mother had disregarded her caseworker's instructions. Rush did not notice a difference in mother's parenting skills as a result of her working with a parenting mentor.

{¶ 28} Nan Hoff, the CASA guardian ad litem for the children at the time of the hearing, testified she was assigned to the case in February 2017. After completing her initial assessment of the case, Hoff's concerns about mother and father included domestic violence, substance abuse, and H.H. not attending school. On a visit to mother's home, Hoff observed J.H. at the residence. Mother stated J.H. was showering at her home because the water was shut off at his apartment on a different street. Mother had not previously told Hoff that J.H. lived next door to her. Hoff did not believe mother was truthful about individuals living at the home.

{¶ 29} Over the approximately two years Hoff had been involved with the case, she had not observed a change in mother's overall parenting ability, despite repeated advice and coaching. Mother often yelled at the children in visits and berated them at family counseling. She failed to watch the children or maintain awareness of the children's actions. However, she had shown slight improvement in her engagement with the children, sometimes engaging with them in an activity. Hoff did not recommend additional family counseling because the children's behaviors escalated after the sessions. Mother had been told not to hit the children, but still spanked M.H.

{¶ 30} Hoff had not spoken with mother regarding domestic violence. Hoff was not concerned about whether mother had successfully completed the portion of her case plan concerning domestic violence.

{¶ 31} Hoff detailed the children's specialized needs and behavioral issues. H.H. had an IEP at school due to her attention-deficit hyperactivity disorder. Hoff was concerned that mother was unable to articulate H.H.'s goals or progress with regard to the IEP, although mother had participated by phone in H.H.'s IEP meetings.

{¶ 32} According to Hoff, H.H. had serious boundary issues resulting from the sexual abuse. She asked to kiss and hug other children at school, looked under bathroom stalls, and showed her private parts to her sibling. Hoff agreed it would be concerning to have people coming in and out of the residence where H.H. was staying due to her boundary issues and sexualized behavior. When H.H. was with mother, H.H. openly defied her or

gave excuses for misbehaving. When at the foster home, H.H. seemed very relaxed, completed homework and chores, and played with siblings.

{¶ 33} Hoff testified C.H. had various behavioral issues including stealing from others, lying, and attempting to touch a sibling in a sexualized fashion. C.H. did not want to listen to mother and openly defied her. Hoff was concerned that mother was unable to articulate C.H.'s goals or progress with regard to the IEP, although she had participated by phone in C.H.'s IEP meetings. At the foster home, C.H. was focused, affectionate, and polite.

{¶ 34} Hoff testified that, when at the foster home, T.H. played with siblings, rarely complained, and spoke about activities and school. At visits with mother, T.H. was frequently getting in trouble. M.H., who was two at the time of the hearing, was generally happy with both mother and foster parents. However, mother often did not know where M.H. was or what she was doing, which especially concerned Hoff considering M.H.'s young age.

{¶ 35} According to Hoff, the children thrived in structured, loving environments which encouraged learning and activities. Mother's home did not appear to be structured. Hoff would not recommend unsupervised visits with mother because she was not aware of what the children were doing and it was not safe for the children.

{¶ 36} Hoff had discussed the proceedings with the children. H.H. wanted to be placed with mother. C.H. refused to make a decision on placement. T.H. wanted to be placed in the foster home. M.H. was too young to understand the proceedings. Hoff recommended FCCS be granted custody of the children for purposes of adoption.

{¶ 37} Lindey Sizemore, supervisor at NYAP, testified she was the supervisor assigned on the case beginning June 19, 2017, and additionally served as caseworker from July 19 to August 27, 2018. On an announced visit to mother's home on August 6, 2018, Sizemore found the rooms were configured for the children and there was no evidence of anyone living in the home aside from mother, A.G., and A.G.'s daughter.

{¶ 38} On an unannounced visit to mother's home on August 29, 2018, an individual Sizemore did not recognize answered the door. Sizemore observed there were items in one of the children's rooms that were not present during the announced visit including adult male clothing on the dresser, a toothbrush, medication, various toiletries, and a pile of

blankets.  Mother told Sizemore the individual who answered the door was J.H.  Mother denied J.H. was living at her home, but admitted the different items in the children's room belonged to him.  Sizemore indicated she was concerned by the difference between the two visits because it appeared that J.H. was living at mother's residence and she was unsure of his relationship to the family.

{¶ 39}  Sizemore recommended the juvenile court grant permanent custody of the children to FCCS because their foster environment was very stable and their special needs were being met. Additionally, Sizemore stated mother had not been completely truthful at times and her parenting skills continued to be a concern.  Sizemore agreed that mother had completed "almost every, if not every, item on the case plan."  (Feb. 14, 2019 Tr. at 225.)

{¶ 40}  J.H. testified he was mother's stepfather and lived next door to mother.  J.H. would often visit mother's house to do laundry and eat.  J.H. was at mother's house when a caseworker visited.  J.H. had never seen mother do anything with the children that he would consider bad parenting or inappropriate.  According to J.H., the ring mother gave to H.H. formerly belonged to his wife, H.H.'s maternal grandmother.  However, J.H. did not know what the ring looked like and did not recall giving mother the ring.

{¶ 41}  Following the hearing, on February 28, 2019, a case plan for the children was filed.  On February 28, 2019, the juvenile court filed a judgment entry adjudicating the children to be dependent, terminating parental rights, adopting the case plan, and granting permanent custody of the children to FCCS.

## II.  Assignments of Error

{¶ 42} Mother appeals and assigns the following four errors for our review:

> [I.] The trial court's adjudication of dependency of the children was not supported by clear and convincing evidence and was against the manifest weight of the evidence.
>
> [II.] Sufficient evidence was not presented to support the finding that the children were dependent.
>
> [III.] The trial court's permanent court commitment of the children to FCCS was not supported by clear and convincing evidence and was against the manifest weight of the evidence that the commitment was in the children's best interest and that the children could not be placed with mother within a reasonable period of time.

[IV.] The trial court's permanent court commitment of the children to FCCS was not supported [by] sufficient evidence that the commitment was in the children's best interest and that the children could not be placed with mother within a reasonable period of time.

## III. Applicable Law and Standard of Review

{¶ 43} "The right to parent one's child is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16, of the Ohio Constitution." *In re L.W.*, 10th Dist. No. 17AP-586, 2018-Ohio-2099, ¶ 6. *See also In re Murray*, 52 Ohio St.3d 155, 157 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("[T]he right to raise one's children is an 'essential' and 'basic civil right.' "). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.* at 157, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

{¶ 44} However, parental rights are not absolute and are always subject to the ultimate welfare of the child. *In re E.B.*, 10th Dist. No. 16AP-352, 2017-Ohio-2672, ¶ 19, citing *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 15, citing *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' Therefore, parents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). An award of permanent custody, which terminates parental rights, is an " 'alternative of last resort and is only justified when it is necessary for the welfare of the children.' " *In re C.G.*, 10th Dist. No. 13AP-632, 2014-Ohio-279, ¶ 28, quoting *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 26.

{¶ 45} Under Ohio law, there are two ways for an agency to seek permanent custody of a child. *In re J.F.*, 8th Dist. No. 105504, 2018-Ohio-96, ¶ 44, citing *In re E.P.*, 12th Dist. No. CA2009-11-022, 2010-Ohio-2761, ¶ 22. Under one method, an agency may first obtain temporary custody of the child and then file a motion seeking permanent custody pursuant to R.C. 2151.413. Or, pursuant to R.C. 2151.353(A)(4), an agency may request permanent custody as part of its original abuse, neglect, or dependency complaint.

{¶ 46} Here, FCCS in its complaint asserted the children were dependent pursuant to R.C. 2151.04 and requested permanent custody. The juvenile court analyzed the matter under R.C. 2151.353(A), which provides:

> If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:
>
> * * *
>
> (4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. If the court grants permanent custody under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.

{¶ 47} Thus, R.C. 2151.353(A)(4) allows a court to grant permanent custody if it determines: (1) the child is an abused, neglected, or dependent child, (2) the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E), and (3) permanent custody is in the child's best interest pursuant to R.C. 2151.414(D)(1). *See In re B.S.*, 4th Dist. No. 18CA890, 2018-Ohio-4645, ¶ 53; *J.F.* at ¶ 48.

{¶ 48} On appeal, we will not reverse a court's determination that it was in the best interest of the children to grant a motion for permanent custody unless such determination is against the manifest weight of the evidence. *L.W.* at ¶ 8; *In re W.W.E.*, 10th Dist. No. 15AP-167, 2016-Ohio-4552, ¶ 54. " 'Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). *See C.G.* at ¶ 31; *W.W.E.* at ¶ 54. Thus, in reviewing a judgment under the manifest weight standard, a court of appeals

weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. *Eastley* at ¶ 20.

{¶ 49} In conducting our review, we must make every reasonable presumption in favor of the court's findings of fact and judgment. *L.W.* at ¶ 8; *Eastley* at ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984), fn. 3. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment.' " *L.W.* at ¶ 8, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988). Moreover, we recognize that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceedings and the impact the court's determination will have on the lives of the parties concerned." (Quotations and citation omitted.) *In re W.D.*, 10th Dist. No. 09AP-589, 2009-Ohio-6903, ¶ 34. We begin our analysis by considering the first part of the proceedings for permanent custody under R.C. 2151.353(A), namely whether FCCS established the children were dependent pursuant to R.C. 2151.04(C).

## IV. First and Second Assignments of Error—Dependency

{¶ 50} In her first and second assignments of error, mother asserts the juvenile court erred in finding the children to be dependent pursuant to R.C. 2151.04(C).

{¶ 51} R.C. 2151.04(C) provides that a "dependent child" is a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." "A finding of dependency under R.C. 2151.04 focuses on whether the child is receiving proper care and support." *In re L.C.*, 10th Dist. No. 12AP-1057, 2013-Ohio-2564, ¶ 20, citing *In re Bibb*, 70 Ohio App.2d 117 (1st Dist.1980). Therefore, a court must consider "the condition or environment of the child, not the fault of the parents." *Id.*, citing *In re Bishop*, 36 Ohio App.3d 123, 124 (5th Dist.1987).

{¶ 52} However, a parent's conduct is relevant to the dependency determination insofar as such conduct forms part of the child's environment. *In re E.M.*, 10th Dist. No. 13AP-284, 2014-Ohio-1026, ¶ 34. "A parent's conduct is significant if it has an adverse

impact on the child sufficient to warrant intervention." *In re L.H.*, 12th Dist. No. CA2018-09-106, 2019-Ohio-2383, ¶ 40, citing *In re T.B.*, 12th Dist. No. CA2014-09-019, 2015-Ohio-2580, ¶ 20.  In order to adjudicate a child dependent pursuant to R.C. 2151.04(C), a court must "necessarily conclude that the parents' custody is detrimental to the child." *In re E.C.*, 10th Dist. No. 18AP-878, 2019-Ohio-3791, ¶ 32, citing *In re Trowbridge*, 10th Dist. No. 03AP-405, 2004-Ohio-2645, ¶ 14.

{¶ 53} R.C. 2151.35(A)(1) provides that "[i]f the court at the adjudicatory hearing finds from clear and convincing evidence that the child is an abused, neglected, or dependent child, the court shall proceed * * * to hold a dispositional hearing and hear the evidence as to the proper disposition to be made under [R.C.] 2151.353." *See In re L.C.* at ¶ 7; *In re N.P.*, 10th Dist. No. 07AP-797, 2008-Ohio-1727, ¶ 7.  "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.  *See In re D.C.*, 10th Dist. No. 08AP-1010, 2009-Ohio-2145, ¶ 9, citing *In re Abram*, 10th Dist. No. 04AP-220, 2004-Ohio-5435 (finding it is not necessary for evidence to be "unequivocal" in order to meet the clear and convincing standard); *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 73.

{¶ 54} Mother contends the juvenile court erred in finding the children to be dependent pursuant to R.C. 2151.04(C) because she lived at her home for two years, cared for another child in her home, paid rent and utilities, and the home was stable. FCCS does not dispute that, at the time of the hearing, mother lived in her home for two years, paid rent and utilities, and cared for another child in her home. However, FCCS contends the conditions and environment, when viewed in the context of the entire history of the case, sufficiently demonstrated the children were dependent.  In determining the children were dependent pursuant to R.C. 2151.04(C), the juvenile court analyzed mother's progress on the case plan including stable housing and income, completing domestic violence classes and developing protective capacity for the children, and completing parenting classes and following recommendations.

{¶ 55} With regard to stable housing and income, the juvenile court found mother had a history of not being able to pay utility bills without assistance. Additionally, the court found "[m]other evidenced no specific financial plan or forethought." (Feb. 28, 2019 Jgmt. Entry at 13.) Cotton testified that mother struggled to pay for utilities and food. Furthermore, mother had not provided proof of stable income as required by her case plan. This is supported by mother's own testimony in which she described her employment as inconsistent.

{¶ 56} Additionally, the court noted several witnesses repeatedly expressed concerns about unknown individuals living at mother's home over the history of the case. According to Rush, mother had been instructed by her caseworker not to allow other people to live with her. Despite this instruction, however, there were repeated discoveries of individuals staying at the home, including in the children's bedrooms. Rush was concerned because she did not know the identity of the individuals staying at mother's home and mother had disregarded the caseworker's instructions. Additionally, Rush was concerned about the protection and safety of the children if other individuals would be sleeping in the same room as them, especially considering the vulnerability of the children resulting from the history of sexual assault.

{¶ 57} Cotton, who did not believe mother met the case plan requirement of providing a stable home, stated that mother was not providing accurate, consistent information to FCCS about the individuals staying at her home. Mother repeatedly denied that other individuals were living at the residence despite evidence to the contrary. Cotton stated that "[t]he ongoing concerns of the persons in the home, in and out of the home on a regular basis is very high risk for the children due to their specialized needs." (Feb. 14, 2019 Tr. at 92.) Similarly, Hoff did not believe mother was truthful about individuals living at the home. Sizemore described an unannounced visit during which she found items in the children's bedroom that had not been present on a prior, announced visit, leading her to believe other individuals were living at the home.

{¶ 58} Next, with regard to domestic violence classes and developing protective capacity for the children, the juvenile court found mother continued to allow father to have contact with the children in her home after the court had ordered no contact between father and the children either directly or indirectly. Rush found father at mother's home on two

unannounced visits in February 2016 and February 2017, which in at least one instance was after mother had finished domestic violence classes. Mother told Rush she was not going to keep the children away from father. Rush had concerns mother was unwilling to prioritize the safety of the children over her relationship with father. However, Cotton testified she had no reason to believe mother was currently in an abusive relationship or in contact with father. Although Hoff had not spoken to mother about domestic violence, she was not concerned whether mother had successfully completed the domestic violence case plan requirements.

{¶ 59} Next, with regard to the parenting requirements in the case plan, the juvenile court found that, despite completing classes and working with a parenting mentor, mother demonstrated she was not capable of parenting the children. The court concluded it was "highly unlikely that additional parenting classes or mentoring will yield a positive change in [m]other's parenting." (Feb. 28, 2019 Jgmt. Entry at 14.)

{¶ 60} Mother completed parenting classes and began participating in parenting mentorship services on July 8, 2015. Although parenting mentorship services ended prior to December 2017 and mother was not referred to a parenting program or parent mentor again until January 28, 2019, she continued to receive advice and coaching during supervised visits.

{¶ 61} Hoff stated mother sometimes engaged with the children in an activity, which was an improvement. However, Hoff stated she had not observed a significant change in mother's overall parenting ability, despite repeated advice and coaching. Mother often yelled at the children in visits and berated them at family counseling. She failed to watch the children or maintain awareness of the children's actions. According to Cotton, mother provided inappropriate discipline and had difficulty managing the children during supervised visits. Despite being told not to hit the children, mother still spanked M.H. and grabbed H.H. by the face to redirect her. Both Hoff and Cotton would not recommend unsupervised visits due to concerns regarding mother's lack of awareness of the children's behavior and concerns regarding the children's safety.

{¶ 62} Based on the foregoing and considering the entirety of the evidence, we cannot agree with mother that the juvenile court's determination that the children were dependent pursuant to R.C. 2151.04(C) was not supported by clear and convincing

evidence. In so finding, we are mindful that "children do '*not* first have to be put into a particular environment before a court can determine that that environment is unhealthy or unsafe.' " (Emphasis sic.) *L.C.* at ¶ 23, quoting *In re Burchfield*, 51 Ohio App.3d 148, 156 (4th Dist.1988), citing *In re Campbell*, 13 Ohio App.3d 34, 36 (12th Dist.1983). "[C]ircumstances giving rise to a legitimate risk of harm may suffice to support an adjudication of dependency under R.C. 2151.04(C)." *L.H.* at ¶ 41, citing *In re N.J.*, 12th Dist. No. CA2016-10-086, 2017-Ohio-7466, ¶ 20. *See In re S Children*, 1st Dist. No. C-170624, 2018-Ohio-2961, ¶ 36; *In re M.E.G.*, 10th Dist. No. 06AP-1256, 2007-Ohio-4308, ¶ 62 (finding children to be dependent where the children's sibling had been sexually abused by father). Therefore, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot find the juvenile court's finding of dependency pursuant to R.C. 2151.04(C) was supported by insufficient evidence or against the manifest weight of the evidence.

{¶ 63} Accordingly, we overrule mother's first and second assignments of error.

## V. Third and Fourth Assignments of Error—Permanent Custody

{¶ 64} In her third and fourth assignments of error, mother asserts the juvenile court erred in finding permanent custody was in the children's best interest and that the children could not be placed with mother within a reasonable period of time.

## A. Placement of the Children

{¶ 65} Having found clear and convincing evidence exists to support the trial court finding the children were dependent pursuant to R.C. 2151.04(C), we consider whether clear and convincing evidence supported the juvenile court's determination that the children cannot be placed with one of the children's parents within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E). R.C. 2151.414(E) provides in pertinent part:

> In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the

following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

* * *

(10) The parent has abandoned the child.

* * *

(16) Any other factor the court considers relevant.

{¶ 66} Here, the juvenile court made the following findings:

*Upon a review and weighing of the evidence, the court finds, by clear and clear* [sic] *evidence*, that there is no credible evidence to support the conclusion that either Parent, given more time and all of the assistance that have been and continue to be available to them, would be successful in achieving a safe reunification with any one or more of the Children. Past reunification efforts have been unsuccessful.

R.C. 2151.414(E)(1) – Following the placement of the Children outside the home and notwithstanding reasonable case planning and diligent efforts by [FCCS] to assist the Parents to remedy the problems that initially caused the Children to be placed outside the home, the Parents have failed continuously and repeatedly to substantially remedy the conditions causing the Children to be placed outside her home.

> R.C. 2151.414(E)(10) – The facts demonstrate that [father] has
> abandoned the Children.

(Emphasis sic.) (Feb. 28, 2019 Jgmt. Entry at 16.) Thus, pursuant to R.C. 2151.414(E)(1), the juvenile court found mother and father failed continuously and repeatedly to substantially remedy the conditions that initially caused the children to be placed outside the home notwithstanding reasonable case planning and diligent efforts by FCCS to assist mother and father to remedy such conditions. Additionally, the juvenile court found father abandoned the children pursuant to R.C. 2151.414(E)(10).[2]

{¶ 67} Mother contends the record does not support evidence of reasonable case planning because no case plan was admitted into evidence. However, testimony at the hearing supported the existence of a case plan and FCCS's efforts to assist mother in meeting the various aspects of the case plan. As a result, we find mother's contention to be without merit.

{¶ 68} Next, mother contends FCCS failed to provide reasonable case planning or diligent efforts to remedy the problems that initially caused the children to be placed outside the home. In support of this argument, mother argues FCCS failed to make any recommendations for parenting classes after her completion of parenting classes on July 8, 2015 until January 28, 2019. The record reflects mother was provided with parenting mentorship services after July 8, 2015 until some point before December 2017, and she continued to receive advice and coaching at supervised visits with the children on an ongoing basis. Furthermore, Cotton testified the parenting referral in January 2019 occurred after a discussion with mother regarding concerns about specific incidents, including spanking M.H. and grabbing H.H. by the face. As a result, we find no merit in mother's contention that FCCS failed to provide reasonable case planning or diligent efforts to remedy the problems that initially caused the children to be placed outside the home.

{¶ 69} Finally, mother contends she remedied the conditions leading to the removal of the children from her home. However, as previously discussed, several witnesses repeatedly expressed concerns about unknown individuals living at mother's home. Cotton testified the presence of unknown individuals in the home presented a concern due to the history of sexual abuse of H.H. and the need to protect the children from further abuse.

---

[2] We note mother does not contest this finding.

According to Rush, mother had been instructed by her caseworker not to allow other people to live with her. Despite this instruction, however, there were repeated discoveries of individuals staying at the home, including in the children's bedrooms. These concerns persisted over the history of the case, including while Hoff served as the children's guardian ad litem, beginning in 2017 through the time of the hearing. Hoff testified she did not believe mother was truthful about individuals living at the home. Sizemore also testified that, on an unannounced visit on August 29, 2018, she found items in the children's bedrooms that were not there on a previous, announced visit which led her to believe J.H. was living at the residence.

{¶ 70} Based on the evidence in the record, including as detailed above in our review of the juvenile court's dependency finding, we cannot agree with mother that the juvenile court erred in finding by clear and convincing evidence that, considering the services and resources that were made available for the purpose of changing parental conduct to allow mother to resume and maintain parental duties, mother failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the children's home. Therefore, we conclude the juvenile court did not err in finding the children cannot be placed with one of the children's parents within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E).[3]

## B. Children's Best Interest

{¶ 71} Finally, we consider whether permanent custody is in the children's best interest pursuant to R.C. 2151.414(D)(1). In determining whether granting permanent custody to a public children services agency is in a child's best interest, the court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

---

[3] We note FCCS's argument that the juvenile court's findings satisfied the requirements under R.C. 2151.414(B)(1)(d) because "the children were already in the custody of [FCCS] for 12 months of a consecutive 22 month period." (FCCS's Brief at 29.) Therefore, FCCS argues "the finding [under R.C. 2151.414(E)(1)] that the children cannot or should not be placed with [mother was] not necessary." (FCCS's Brief at 29.) Because the juvenile court analyzed the complaint under R.C. 2151.353(A)(4), and we have found the juvenile court did not err in its analysis of R.C. 2151.414(E)(1), we need not address FCCS's argument.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced by R.C. 2151.414(D)(1)(e) are:

(7) The parent has been convicted of or pleaded guilty to one of [a list of criminal offenses]:

* * *

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order

was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 72} Here, in concluding the granting of permanent custody of the children to FCCS was in the best interest of the children, the juvenile court considered and weighed the factors set forth in R.C. 2151.414(D)(1)(a) through (e). Under the first factor, the court must consider the "interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child." R.C. 2151.414(D)(1)(a). Mother contends her bond with the children should cause this factor to weigh for mother and against FCCS.

{¶ 73} Cotton testified that although the children were bonded with mother, contact "seem[ed] forced a lot of times with the children at the [] visits." (Feb. 14, 2019 Tr. at 90.) Staff supervising visits often needed to provide redirection and guidance to mother. At a recent visit, after being told not to hit the children, mother spanked M.H., grabbed H.H. by the face to redirect her, and ordered excessive time-outs. Although H.H., C.H., and T.H. were removed from mother's custody on August 31, 2015 and M.H. on August 24, 2016, mother had not progressed beyond supervised visits with the children. *See In re K.T.1,* 1st Dist. No. C-180335, 2018-Ohio-4312, ¶ 62-63 (finding mother's lack of progress from supervised visitation relevant to best-interest determination).

{¶ 74} Hoff testified mother often yelled at the children during visits and berated them at family counseling. Mother failed to watch the children or maintain awareness of their actions. However, she had shown some improvement in her engagement with the children, sometimes engaging with one or two of the children in an activity. C.H. and H.H.

openly defied mother. Mother frequently yelled at T.H. M.H. was happy around mother, although mother did not always maintain awareness of M.H.'s actions, which was concerning given her age. None of the children had a bond with father.

{¶ 75} Cotton testified the children were bonded to their foster parents. When at the foster home, H.H. seemed very relaxed, completed homework and chores, and played with siblings. C.H. was focused, affectionate, and polite. T.H. was very affectionate with his foster parent, played with siblings, and shared about his activities. According to Sizemore, the foster environment was very stable and the children's special needs were being met by the foster parents. Because of the clear, convincing evidence supporting the juvenile court's findings, we cannot find the juvenile court erred in its consideration of the interaction and interrelationship of the children with their parents under R.C. 2151.414(D)(1)(a).

{¶ 76} Under the second factor, the court must consider the "wishes of the child." R.C. 2151.414(D)(1)(b). According to Hoff, H.H. wanted to live with mother, C.H. was unwilling to choose where to live, T.H. wanted to live at the foster home, and M.H. was too young to understand. Hoff, who served as volunteer guardian ad litem, recommended the court grant permanent custody to FCCS.

{¶ 77} The juvenile court considered the third and fourth factors together. Under the third factor, the court must consider the "custodial history of the child." R.C. 2151.414(D)(1)(c). Under the fourth factor, the court must consider the "child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." R.C. 2151.414(D)(1)(d). The juvenile court found all the children had been in FCCS's custody for over two years.[4] Furthermore, the juvenile court found the "[c]hildren need a permanent placement now," but none of the children could be placed with mother or father "now or within a reasonable time as [mother and father] are not able or willing to meet the needs of the [c]hildren." (Feb. 28, 2019 Jgmt. Entry at 15.) The court concluded that "a legally secure permanent placement cannot be achieved for the [c]hildren without an order of permanent custody to [FCCS]." (Feb. 28, 2019 Jgmt. Entry at 15.)

---

[4] We note that, as of this writing, the uncontested fact that all of the children have been in FCCS custody for over four years.

**{¶ 78}** Mother does not contest the third factor, but argues the juvenile court erred in its consideration of the fourth factor because the record did not establish mother was unable or unwilling to provide for the needs of her children. As previously noted, mother had not been able to progress beyond supervised visits with the children in the more than two years they had remained in FCCS's custody. At the time of the hearing, Hoff would not recommend unsupervised visits with mother because mother's home was not structured. It was not safe for the children to be with mother unsupervised because she was unaware of the children's actions. Thus, we cannot find the juvenile court erred in its consideration of the custodial history of the children and the children's need for legally secure, permanent placement under R.C. 2151.414(D)(1)(c) and (d).

**{¶ 79}** Under the fifth factor, the court must consider "[w]hether any of the factors in [R.C. 2151.414(E)(7) through (11)] apply in relation to the parents and child." R.C. 2151.414(D)(1)(e). The court found that "[n]o evidence was offered as to the best interest factors listed in [R.C. 2151.414(E)(7) through (11)]." (Feb. 28, 2019 Jgmt. Entry at 15.)[5]

**{¶ 80}** Although not listed under its analysis of the factors specifically identified in R.C. 2151.414(D)(1), the juvenile court made the following findings in determining the best interest of the children:

> The evidence is clear and convincing that: (1) None of the Children should be immediately placed with Mother or [Father], with or without protective supervision; (2) None of the Children can be placed with Mother or [Father] within a reasonable time and should not be placed with either parent. It would not be in the best interest for any of the Children to remain in foster care with the false hope that a parent will achieve reunification; (3) The Children have now been in [FCCS's] temporary custody for *over 2 years*; (4) The Children do not meet the requirements for a planned permanent living arrangement; (5) Prior to the hearing, no relative or other interested person filed, or [has] been identified in, a motion for legal custody of the Children.
>
> [The Children] each need permanency in a stable and fully supportive family. The Court previously identified several significant special needs of H.H., C.H., and T.H. including inappropriate touching and sexualized behavior by H.H. and

---

[5] We note the juvenile court found that "[t]he facts demonstrate that [father] has abandoned the [c]hildren" pursuant to R.C. 2151.414(E)(10). (Feb. 28, 2019 Jgmt. Entry at 16.)

C.H. While Mother installed cameras in her home to monitor the Children, she was unsuccessful in monitoring the Children when they were all in one room. Cameras will not change this fact. Additionally, each of the three older children has an individual education plan (IEP) and needs the help of a capable parent to assist them with school success. After Mother participated in an IEP meeting by phone, she could not identify what the plan was, Mother was unable [to] assure that H.H. attended school when she was the only child of school age. Each of these three children has significant special needs that Parents are either unable or unwilling to provide. As yet, M.H. has no identified special needs. The court concludes that if custody of any of the Children were returned to Mother, it is unlikely she could adequately provide for that child's emotional, educational, and safety needs.

The Children's foster parents see to all of the Children's basic and special needs.

(Emphasis sic.) (Feb. 28, 2019 Jgmt. Entry at 14-15.)[6]

{¶ 81} Mother also contends the juvenile court "erroneously placed a burden on [mother] to prove she would 'be successful in achieving a safe reunification with any one or more of the children.' " (Mother's Brief at 32, quoting Feb. 28, 2019 Jgmt. Entry at 16.) As previously noted, the juvenile court made the following findings:

Upon a review and weighing of the evidence, the court finds, by clear and clear [sic] evidence, that there is no credible evidence to support the conclusion that either Parent, given more time and all of the assistance that have been and continue to be available to them, would *be successful in achieving a safe reunification with any one or more of the Children*. Past reunification efforts have been unsuccessful.

R.C. 2151.414(E)(1) – Following the placement of the Children outside the home and notwithstanding reasonable case planning and diligent efforts by [FCCS] to assist the Parents to remedy the problems that initially caused the Children to

---

[6] We note the juvenile court appears to have engaged in analysis under R.C. 2151.414(D)(2). We have stated that insofar as "a juvenile court employs the R.C. 2151.414(D)(1) method of determining the child's best interest, the court need not also conduct the R.C. 2151.414(D)(2) analysis." *In re J.P.*, 10th Dist. No. 18AP-834, 2019-Ohio-1619, ¶ 40, citing *In re T.P.*, 11th Dist. No. 2018-A-0001, 2018-Ohio-1330, ¶ 27-28. As we ultimately conclude that, pursuant to R.C. 2151.414(D)(1), there was clear and convincing evidence that granting the motion for permanent custody was in the best interest of the children and the juvenile court's decision was not against the manifest weight of the evidence, we need not consider any of mother's arguments related to R.C. 2151.414(D)(2).

be placed outside the home, the Parents have failed continuously and repeatedly to substantially remedy the conditions causing the Children to be placed outside her home.

R.C. 2151.414(E)(10) – The facts demonstrate that [father] has abandoned the Children.

(Emphasis added and deleted.) (Feb. 28, 2019 Jgmt. Entry at 16.) It is clear from the above that the portion of the entry about which mother complains was in reference to the juvenile court's consideration of the findings under R.C. 2151.414(E), not the best interest findings under R.C. 2151.414(D)(1). Furthermore, we find no merit in mother's contention that the juvenile court shifted the burden of proof.

{¶ 82} Finally, mother contends that although the juvenile court found by clear and convincing evidence that granting permanent custody to FCCS was in the children's best interest, it failed to "continue its analysis by looking at the factors in [R.C.] 2151.414(B) as required." (Mother's Brief at 32.) R.C. 2151.414(B) provides in pertinent part:

(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

Contrary to mother's contention, the juvenile court was not required to engage in this analysis because the juvenile court analyzed FCCS's request for permanent custody in the original complaint pursuant to R.C. 2151.353(A), not 2151.413 and 2151.414(A). However,

even assuming the juvenile court was required to consider the factors under R.C. 2151.414(B), there was no error since the court found the children had been in FCCS's uninterrupted custody for over two years, satisfying the factor listed under R.C. 2151.414(B)(1)(d).  As a result, we find mother's contention to be without merit.

{¶ 83} Although mother demonstrated some improvement over the history of the case, considering all the circumstances the juvenile court determined she was unfit to parent during much of the children's lives.  *E.C.* at ¶ 34.  The fundamental right to parent one's child is " 'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' "  *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 20, quoting *Cunningham* at 106.  Therefore, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find the manifest weight of the evidence supports the juvenile court's determination that granting permanent custody to FCCS was in the children's best interest.  Accordingly, we overrule mother's third and fourth assignments of error.

## VI.  Conclusion

{¶ 84} Having overruled mother's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BROWN and BEATTY BLUNT, JJ., concur.