[Cite as *In re B.B.*, 2021-Ohio-2299.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| B.B. et al., | : | No. 20AP-488 |
| [J.B., | : | (C.P.C. No. 20JU-2288) |
| Appellant]. | : | (REGULAR CALENDAR) |
| In the Matter of: | : | |
| B.B. et al., | : | No. 20AP-490 |
| [B.B. et al., | : | (C.P.C. No. 20JU-2288) |
| Appellants]. | : | (REGULAR CALENDAR) |
| In the Matter of: | : | |
| B.B. et al., | : | No. 20AP-517 |
| [H.B., | : | (C.P.C. No. 20JU-2288) |
| Appellant]. | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on July 6, 2021

**On brief:** *John T. Ryerson*, for appellant J.B.

**On brief:** *David K. Greer*, for appellants B.B. et al.

**On brief:** *William T. Cramer*, for appellant H.B.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

**On brief:** *David L. Rowland*, Guardian ad Litem.

APPEALS from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

SADLER, J.

{¶ 1}  Appellants, H.B. ("Mother"), J.B. ("Father"), and their seven biological children (collectively "the children"), appeal a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted appellee, Franklin County Children Services ("FCCS"), permanent custody of the children for purposes of adoption.  For the following reasons, we affirm that judgment.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  The relevant background events of this case were documented previously by this court in *In re M.B.*, 10th Dist. No. 19AP-460, 2020-Ohio-550:

> On April 20, 2016, appellee, Franklin County Children Services ("FCCS"), filed two complaints with the trial court alleging the children were dependent. One complaint concerned the older four siblings (B.B., T.B., A.B., and C.B.), and other complaint concerned the three younger siblings (M.B., J.W.B., and D.B.). The complaints alleged that the school-aged children were often absent from school, the family was struggling to maintain housing, and Father had tested positive for illegal drugs.
>
> At a preliminary hearing held on April 27, 2016, a magistrate initially granted FCCS temporary orders of custody for the children.  In judgments effective June 14, 2016, the trial court adjudicated the children dependent children, and it committed the children to FCCS' temporary custody pursuant to R.C. 2151.353(A)(2).  In judgments effective April 27, 2017, the trial court granted FCCS' motions to extend the agency's temporary custody of the children for an additional six months.
>
> FCCS moved for permanent custody of the children on September 19, 2017.  In judgments dated April 1, 2019, the trial court denied the agency's motions.
>
> Having rejected granting FCCS permanent custody, the trial court immediately turned its attention to exploring whether it was in the children's best interests to return the children to Mother's custody.  In the judgments denying the motion for permanent custody, the trial court set a hearing for May 6, 2019 to "review [the] orders as to custody, and [ ] consider protective supervision, Father's visitation rights, and Father's obligation to pay child support to Mother."  (Apr. 1, 2019 Jgmt. Entries Den. Permanent Custody at 16.)  The trial court ordered Mother to:

> make arrangements to resume a parenting program, make arrangements for family counseling between the Children and herself, and * * * be prepared to present evidence of an executed lease for and the furnishing of housing for the Children and herself and a budget based on a realistic estimation of the expenses of her family and available financial resources.

> *Id.* In the meantime, the trial court provided that FCCS would "retain temporary custody * * * of the Children herein until further order of the Court." *Id.*

> The May 6, 2019 hearing occurred as scheduled. Apparently, the trial court was unsatisfied with Mother's compliance with its April 1, 2019 orders because it did not alter the existing custody arrangement after the hearing. Instead, in the May 6, 2019 orders that resulted from the hearing, the trial court imposed even more requirements on Mother: she was to perform drug screens; bar overnight visitors, Father, Father's brother, and her sister-in-law from her home; and bring a budget and detailed childcare plan to the next hearing.

> On May 30, 2019, FCCS again moved for permanent custody of the children. FCCS represented in its motions that Mother had not complied with the trial court's April 1, 2019 and May 6, 2019 orders. Both Father and the children filed memoranda in opposition to the second motion for permanent custody.

*Id.* at ¶ 2-7.

**{¶ 3}** Before resolution of the merits of FCCS' second motion for permanent custody, on June 14, 2019, Mother filed in both cases a "Reply to Post-Permanent Custody Denial Motions and Memorandums," which questioned whether the trial court had the jurisdiction necessary to extend FCCS' temporary custody of the children. The trial court denied that motion, and Mother, Father, and the children appealed. This court granted FCCS' motion to dismiss the appeals for lack of a final, appealable order and noted the second permanent custody hearing was slated for later that month (February 2020). *In re M.B.* at ¶ 16-17. The parents and the children filed a motion to certify a conflict between our decision and a case from another appellate district, *In re D.J.*, 8th Dist. No. 107203, 2019-Ohio-1645.

**{¶ 4}** The conflict motion was not resolved, however, because on February 25, 2020, FCCS filed a new complaint in the trial court asserting the children are dependent

under R.C. 2151.04(C) and, within the body of the complaint, requesting permanent custody of the children for the purposes of adoption. The complaint states the children "were previously found to be Dependent Minors pursuant to [the previous 2016 case numbers] due to housing concerns, parental substance abuse, and educational neglect." (Feb. 25, 2020 Compl. at 1.) It continues, "parents have made little case plan progress (father has not followed the recommendation for inpatient treatment, completed random urine screens, made himself available for home visits, maintained stable housing, or provided proof of income; mother has failed to complete random urine screens, failed to successfully complete substance abuse treatment; parents were evicted from their home in July of 2018 and were living in hotels before and after." (Compl. at 1.)

{¶ 5} The complaint discusses FCCS' previous motion for permanent custody and the trial court's April 2019 denial of that motion and retention of temporary custody of the children with associated new orders. The orders cited in the complaint include those requiring Mother "to resume a parenting program, make arrangements for family counseling between the children and herself, and be prepared to present evidence of an executed lease and the furnishing of housing for the children and herself, and to present a realistic budget"; and additional orders on May 6, 2019 requiring "mother and father to comply with an instant drug screen, maintain[] all previous orders from the April 1, 2019 Judgment Entry, maintain[] all case plan orders, and * * * Mother to resume parenting and arrange family counseling[,] * * * bring a detailed childcare plan and budget to the next hearing[,] * * * [and] complete urine screens three times per week." (Compl. at 2.)

{¶ 6} The complaint states the Father, Father's brother, and sister-in-law were ordered to not to be in the home, and on May 24, 2019, during an unannounced home visit, the caseworker observed the sister-in-law in the home and "also observed [Father's] shoes and belongings in the home" and notes that the caseworker "has not been permitted in the home since May 24, 2019." (Compl. at 2.) The complaint states that Mother's address is listed for Father in each of the cases and "[i]t is believed parents are still residing together." (Compl. at 2.)

{¶ 7} Regarding drug abuse, the complaint states although Mother did not have a current prescription for buprenorphine (suboxone), "[o]n May 30, 2019 mother tested positive for buprenorphine"; "[o]n May 31, 2019, mother tested positive for buprenorphine

and marijuana"; Mother has missed 114 urine screens as of May 6, 2019; and mother is not linked with substance abuse treatment at this time. Father tested positive for amphetamines, buprenorphine, cocaine, and marijuana on May 6, 2019, "missed all 120 screens he has been scheduled for since then," and is not linked with a substance abuse treatment program. (Compl. at 2.) The complaint also alleges that Father has warrants for failure to appear out of three Franklin County Municipal Court cases involving possession of a counterfeit controlled substance and operating a motor vehicle without a license and that Mother has not provided proof of completion of a parenting class. The complaint states that "[a]ll children remain in foster care together, where they are doing well." (Compl. at 2.)

{¶ 8} The complaint concluded that, in accordance with R.C. 2151.414(B)(1), the children "have been in the temporary custody of FCCS for 12 or more months of a consecutive 22 month-period" and, citing R.C. 2151.414(E)(1), (2), (4), and (14), "[t]he children cannot be placed with their parents within a reasonable time and should not be placed with the parents." (Compl. at 2.) Therefore, FCCS requested within the complaint permanent custody of the children for the purposes of adoption.

{¶ 9} After the new complaint was filed, the trial court issued a temporary order of custody of the children under a new case number (20JU-2288) pending an adjudication hearing. (Mar. 3, 2020 Order at 1.) The order allowed Mother and Father supervised visits with the children and ordered both Mother and Father to complete mental health assessments, alcohol/drug assessments, and random drug screens. Father was ordered to resolve his outstanding warrants.

{¶ 10} A few days later, on March 9, 2020, the trial court dismissed the 2016 dependency complaints "at complainant's request." (Mar. 9, 2020 Entries of Dismissal at 1.) The entry of dismissal remarks: "orders issued under 20 JU 2288." (Mar. 9, 2020 Entries of Dismissal at 1.)

{¶ 11} On July 20, 2020, the children filed a motion in limine requesting that evidence from the 2016 dependency cases, "including case plans, orders and judgment entries on those case numbers, and alleged lack of compliance in those cases, be excluded from consideration in the adjudication of [the newly filed 2020] case." (July 20, 2020 Mot. in Limine at 1.) The children believed that "the decision by FCCS to file a new complaint,

while resolving one legal issue (the two-year [temporary] custody limit), created new issues: whether the dismissals had a preclusive *res judicata* effect on the former orders, and whether the dismissals conclusively resolved the facts in those cases in favor of the parents and children based on collateral estoppel." (Emphasis sic.) (July 20, 2020 Mot. in Limine at 2.)

{¶ 12} An adjudication hearing on the children's dependency was then held in late July 2020. Mother and Father, who were present and represented by counsel, testified. Additional testimony was provided by the caseworker and the guardian ad litem ("GAL"). During the hearing, Father, Mother, and the children objected to the use of evidence from the dismissed cases to adjudicate the children dependent; the trial court overruled the objections, finding such evidence of the children's custodial history to be relevant to the present dependency action. On August 10, 2020, the trial court overruled the children's motion for limine and adjudicated them to be dependent pursuant to R.C. 2151.04(C). The trial court maintained the temporary order of custody and set the matter for a dispositional hearing on August 27, 2020.

{¶ 13} At the dispositional hearing, Mother and Father were again present and represented by counsel. Mother, the caseworker, and the GAL testified; Father did not testify. The trial court judge also conducted an in-camera interview of six of the seven children as to their wishes on custody; one of the children did not wish to be interviewed. The children at the time of the hearing ranged from six years old to sixteen years old.

{¶ 14} Following the dispositional hearing, the trial court issued on October 13, 2020 a decision and judgment granting permanent custody of the children to FCCS for purposes of adoption. In doing so, the trial court first incorporated the findings of fact issued for the adjudicatory hearing and noted it had ruled at the adjudicatory hearing that the parents' compliance or noncompliance with the case plans and other orders of the now dismissed cases, as well as orders issued under the instant case number, were all relevant to the issue before the court at the disposition hearing: "Should the Court grant the Agency permanent custody or an alternative disposition allowed by R.C. 2151.353? " (Oct. 13, 2020 Decision at 4.)

{¶ 15} In answering that question, the trial court first determined, in accordance with R.C. 2151.414(E), that the children cannot be placed with either parent within a

reasonable period of time or should not be placed with the parents. Specifically, the trial court found that clear and convincing evidence showed: "following the placement of the Children outside of their home and notwithstanding reasonable case planning and diligent efforts by the Agency to assist the Parents to remedy the problems that initially caused the Children to be placed outside their home, the Parents have failed continuously and repeatedly to substantially remedy the conditions causing the Children to be placed outside their home," and "Parents have demonstrated a lack of commitment toward the Children by failing to timely engage in and complete the reunification case plan." (Decision at 5, citing R.C. 2151.414(E)(1) and (4).)

{¶ 16} The trial court then determined, in accordance with R.C. 2151.414(D), granting permanent custody to FCCS for the purpose of adoption is in the best interest of each of the children. The trial court considered the wishes of the children to return to their parents and their apparent bond with the parents and with each other; their bond with their foster parents but "to a lesser degree" than with their parents; the opinion of the GAL and caseworker that the court grant FCCS permanent custody for purposes of adoption; the long custodial history of the children, who were removed and have been in the same foster home since April 27, 2016, and the corresponding need for permanency; that no relative is available to obtain custody of the children; that the children are "fully adoptable" as a sibling group either by their current foster family, who is considering adopting them, or by others; and the children's current school placement where they are doing well generally and where two children are on "IEP[s]." (Decision at 6, 7.) The trial court found no evidence was offered as to the best interest factors listed in R.C. 2151.414(E)(7) through (11). Finally, the trial court found FCCS "made reasonable efforts to prevent the removal of the Children from the Children's home, eliminate the continued removal of the Children from the Children's home, and safely return the Children to the Children's home." (Decision at 8, citing R.C. 2151.419.)

{¶ 17} Mother, Father, and the children filed timely appeals. Those appeals were consolidated for review.

## II. ASSIGNMENTS OF ERROR

{¶ 18} Mother submits two assignments of error:

[1.] The evidence and filings from the prior case numbers, and the current motion for permanent custody, were all barred by res judicata.

[2.] The juvenile court's judgment terminating parental rights and granting permanent custody to the agency is not supported by clear and convincing evidence.

{¶ 19} Father submits four assignments of error:

1. The Court below erred in admitting evidence from two previous cases that were actually litigated and decided that held that the FCCS' motion for permanent custody should be overruled and denied.

2. The Court below erred in finding that the children, although arguably Dependent, could not be returned to Mother's custody within a reasonable amount of time.

3. The Court erred in failing to consider adopting a reunification case plan, and giving the parents the usual one year period to comply with the requirements of the reunification case plan.

4. The Court below erred in specifically failing to consider other available dispositional alternatives, and failing to make a separate finding of fact concerning why they were not considered, even though on the record the Court said it would do so.

{¶ 20} The children submit three assignments of error:

[1.] The trial court erred in allowing the agency to relitigate facts from the former dependency cases, which had been dismissed with prejudice.

[2.] The trial court erred in relitigating the disposition of permanent custody.

[3.] Permanent custody was not proven by clear and convincing evidence because the trial court had less drastic dispositional options available.

## III. STANDARD OF REVIEW

{¶ 21} "A trial court's determination in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 13, citing *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312. In a permanent custody case, the court of appeals "will not overturn a permanent custody order when it is supported by competent, credible evidence." (Citations omitted.) *In re C.W.*, 10th Dist. No. 19AP-309, 2020-Ohio-1248, ¶ 51. The

reviewing court "must make every reasonable presumption in favor of the judgment and the trial court's findings of facts." (Internal quotations omitted.) *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 13. Purely legal questions are reviewed de novo on appeal. *Zimmer v. Zimmer*, 10th Dist. No. 00AP-383 (Feb. 27, 2001); *see, e.g.*, *In re N.M.P.*, 160 Ohio St.3d 472, 2020-Ohio-1458, ¶ 1, 13-29 (determining the meaning of the "twelve or more months of a consecutive twenty-two-month period" requirement stated in R.C. 2151.414(B)(1)(d)).

## IV. ANALYSIS

{¶ 22} A parent has a "fundamental liberty interest * * * in the care, custody, and management of [his or her] child." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The Supreme Court of Ohio has noted "[p]ermanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * [P]arents 'must be afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16 (6th Dist.1991). "However, the parent's rights are not absolute." *In re Shifflet*, 4th Dist. No. 06CA13, 2006-Ohio-3576, ¶ 20. "[I]t is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." (Internal quotation omitted.) *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). "Parental interests must be subordinated to the child's interest in determining an appropriate disposition of any petition to terminate parental rights." *Id.* "Consequently, the state may terminate parental rights when the child's best interest demands such action." *In re Shifflet* at ¶ 20.

{¶ 23} "In Ohio, there are two methods by which a child may be committed to the permanent custody of a public children services agency." *In re Swisher*, 10th Dist. No. 02AP-1408, 2003-Ohio-5446, ¶ 27, citing *In re Ament*, 142 Ohio App.3d 302 (12th Dist.2001). "Under one method, an agency may first obtain temporary custody of the child and then file a motion seeking permanent custody pursuant to R.C. 2151.413." *In re H.H.*, 10th Dist. No. 19AP-158, 2019-Ohio-4953, ¶ 45. "Or, pursuant to R.C. 2151.353(A)(4), an agency may request permanent custody as part of its original abuse, neglect, or dependency complaint." *Id.*

{¶ 24} Here, FCCS sought within its complaint a disposition of permanent court commitment for the purposes of adoption pursuant to R.C. 2151.353. (Compl. at 3-4.) Therefore, R.C. 2151.353(A)(4) governs this analysis.[1]  *See In re B.S.*, 4th Dist. No. 18CA890, 2018-Ohio-4645, ¶ 55 (finding R.C. 2151.353(A)(4), rather than R.C. 2151.413, governed the analysis where the agency sought permanent custody by requesting it as the initial disposition in its amended neglect and dependency complaint).

{¶ 25} In considering a complaint requesting permanent custody pursuant to R.C. 2151.353(A)(4), the trial court may commit a child adjudicated abused, neglected, or dependent to the permanent custody of the agency if the court determines: (1) that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent in accordance with R.C. 2151.414(E); and (2) that permanent commitment is in the best interest of the child in accordance with R.C. 2151.414(D).  R.C. 2151.353(A)(4); *In re Swisher* at ¶ 27.  *See, e.g., In re J.F.*, 8th Dist. No. 105504, 2018-Ohio-96, ¶ 44-67, *appeal not accepted*, 152 Ohio St.3d 1467, 2018-Ohio-1795 (applying R.C. 2151.353(A)(4) analysis).

{¶ 26} Furthermore, R.C. 2151.353(I) directs that the trial court is prohibited from issuing a dispositional order pursuant to R.C. 2151.353(A) that removes a child from the child's home unless the court complies with R.C. 2151.419.  R.C. 2151.419 provides (in pertinent part) that, at any hearing held pursuant to R.C. 2151.353 "at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the * * * agency that filed the complaint in the case, removed the child from [the] home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."  R.C. 2151.419(A).  The agency bears "the burden of proving that it has made those reasonable efforts."  R.C. 2151.419(A).

{¶ 27} Here, the appellants' assignments of error can be distilled into four main issues: (1) whether evidence and orders from the dismissed 2016 cases could be used to support FCCS' 2020 complaint for dependency and permanent custody; (2) whether the

---

[1] This procedure is also called a "direct PCC."  (Children's Brief at 5; Father's Brief at 17; Feb. 25, 2020 FCCS Admis. Sheet at 1.)

trial court erred in making findings under R.C. 2151.414(E) and, relatedly, whether a reunification case plan was required under the new case number; (3) whether the trial court's best interest of the child determination was supported by clear and convincing evidence; and (4) whether the trial court was obliged to consider options other than granting permanent custody to FCCS.

### A. Evidence and Orders From Dismissed 2016 Cases

{¶ 28} The children argue the trial court erred in allowing the agency to relitigate facts from the former dependency cases, which the children assert was dismissed with prejudice, and erred in allowing the disposition of permanent custody to be relitigated considering that issue was adjudicated in the prior cases. Specifically, the children believe because the entries of dismissal did not specify whether the dismissals were with or without prejudice, and the trial court had denied previously FCCS permanent custody of the children, the 2016 cases were dismissed with prejudice pursuant to Civ.R. 41(B)(3) and operated as a judgment on the merits. Therefore, in the children's view, res judicata prevented FCCS from refiling for dependency and permanent custody using the same facts as before: "The trial court should have treated the current case as a new case based on facts not previously litigated. [It] should not have been about a 'continuing course of conduct.' " (Children's Reply Brief at 2.)

{¶ 29} Mother joins in the children's arguments, specifying that where a prior dependency case is dismissed "with prejudice" after the court denied permanent custody, FCCS cannot refile the same complaint and relitigate permanent custody on the same facts. (Mother's Brief at 34.) Similarly, Father argues res judicata barred the trial court from utilizing evidence from the 2016 cases to "partially justify" its dispositional entry granting permanent custody. (Father's Brief at 12.) He believes that since this case is a "separate, brand new filing," it was legally incorrect and fundamentally unfair to the parents to "bootstrap" previous evidence from 2016 through 2018 to justify the award of permanent custody to FCCS. (Father's Brief at 14; Father's Reply Brief at 7.)

{¶ 30} FCCS counters that the prior cases were dismissed without prejudice and notes that the trial court in the dismissal entries expressly incorporated orders from the 2016 cases into the new case number. FCCS additionally contends that even if those cases were dismissed with prejudice, it would have no legal effect since the case was tried based

on the current state of affairs including the parents' continuing course of conduct. FCCS believes the doctrine of res judicata is not applicable to a dependent child case or to a permanent custody proceeding, and evidence of progress on the prior case plans is proper under R.C. 2151.414(D)(1)(d), (E), and case law.

{¶ 31} We agree with FCCS' position. Generally, res judicata does not "bar[] the trial court from awarding permanent custody of [children at issue]" even where the trial court previously denied the agency permanent custody of the children. *In re Ament*, 142 Ohio App.3d at 310. While appellants argue the instant adjudication and disposition is different since those determinations were, in their view, wholly based on evidence previously litigated in their favor under the 2016 case numbers, this premise is not supported by the record. Both the hearing on the adjudication and the disposition did include "current events" as of the respective hearing dates. (*See* Children's Brief at 15.) At those hearings, testimony was provided on the current stability of housing, compliance with the March 3, 2020 court order relating to drugs screens, mental and alcohol and drug assessments and recommended treatments, and Father's progress on resolving his warrants, for example. The appellants agree that current events serve as a proper basis for a permanent custody determination.

{¶ 32} Furthermore, the trial court's consideration of these current events within the greater context of the children's custodial history, which spanned over four years and multiple case numbers, was not barred by res judicata or otherwise in error. Res judicata "operates to bar litigation of all claims which were or might have been litigated in a first lawsuit." (Internal quotations omitted.) *Kelm v. Kelm*, 92 Ohio St.3d 223, 227 (2001). As pointed out by the children, res judicata is not entirely inapplicable in the context of the juvenile law. *See, e.g., In re A.R.*, 10th Dist. No. 16AP-482, 2017-Ohio-1575 (finding res judicata barred the state's second motion to relinquish jurisdiction over defendant juvenile and bind him over to the common pleas court under R.C. 2152.12 because the denial of the state's first motion was the functional equivalent of a dismissal of a criminal indictment and constituted a final, appealable order under R.C. 2945.67(A)). However, we find the circumstances here, a custody case predicated on the best interests of the children, is distinct from the situation presented in *In re A.R.* and renders the application of res judicata inappropriate in this case.

{¶ 33} "The very purpose of *res judicata* is to deter the repeated litigation of resolved issues, thereby ensuring finality in judgments and the conservation of judicial resources. * * * However, in the area of custody and visitation, we sacrifice finality and some of our limited judicial resources in order to secure a higher value—the best interests of children." (Emphasis sic.)    *Kelm* at 227.    Thus, unlike typical actions, "permanent-custody proceedings require the court to look at the past, present and future when determining the child's best interests and whether the child can be placed with a parent within a reasonable time period." *In re J.G.S.*, 1st Dist. No. C-180611, 2019-Ohio-802, ¶ 27. The parents' "pattern of conduct" is relevant to a permanent custody determination. *Id.*, citing *In re Stephens*, 7th Dist. No. 2001 CA 56, 2002-Ohio-3057, ¶ 27.

{¶ 34} This court has adopted this position. " '[N]othing prohibits a court from basing a permanent custody decision upon a parent's past history with a children services agency. In fact, courts have recognized that a parent's past history is one of the best predictors of future behavior.' " *In re M.W.*, 10th Dist. No. 19AP-769, 2020-Ohio-5199, ¶ 48, quoting *In re West*, 4th Dist. No. 05CA4, 2005-Ohio-2977, ¶ 28. *In re M.W.* expanded at length on this concept:

> [A] parent's "past parenting history and her ability to comply with prior reunification plans regarding her other children [are] relevant considerations in the juvenile court's dispositional determination to commit [mother's current child] to the permanent custody of the Department." *In re Brown*, 60 Ohio App.3d 136, 139, 573 N.E.2d 1217 (1st Dist.1989). *See In re Vaughn*, 4th Dist. No. 00CA692, 2000 Ohio App. LEXIS 5938 (Dec. 6, 2000) (noting that "[t]o further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct," as "[s]ome of the most reliable evidence for the court to consider is the past history of the children and the parents"); *In re J.B.*, 6th Dist. No. S-14-005, 2015-Ohio-460, ¶ 96 (holding that "[i]nformation about the family's history with children services," including testimony about "past referrals regarding the family which were unrelated to this case," were "relevant and admissible in a permanent custody action"); *In re T.W.*, 10th Dist. No. 10AP-897, 2011-Ohio-903, ¶ 28 (holding that appellant's "failure to complete case plan objectives with respect to T.W.1, T.W.2, T.J., and N.H. [was] clearly relevant to the determination of whether appellant ha[d] remedied the problems that caused [her youngest child] C.H.'s removal").

*Id.* at ¶ 28. Thus, in *In re M.W.*, we considered the "entire custodial history" of the child involved, including events occurring under previous case numbers. *Id.* at ¶ 1-3, 31, 48-50. Likewise, in *In re H.H.*, where FCCS refiled a complaint alleging children were dependent and requested permanent custody of the children within the complaint, this court determined both the trial court's dependency determination and the disposition of permanent custody were supported by "the entirety of the evidence," including testimony as to the parent's compliance with case plans filed under other case numbers. *Id.*, 2019-Ohio-4953, at ¶ 50-62 (dependency determination); ¶ 65-83 (disposition determination).

{¶ 35} Moreover, the relevancy and importance of the full custodial history of the children, including parents' compliance with case plans issued under other case numbers, is expressed statutorily and supports the overriding goal of such actions to reach a disposition that is in the children's "best interests." *In re Cunningham*, 59 Ohio St.2d at 105-06. *See* R.C. 2151.414(E) (a trial court "shall consider all relevant evidence" in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents pursuant to R.C. 2151.353(A)(4)); R.C. 2151.414(D)(1)(c) (the third best interest factor expressly states the court must consider the "custodial history of the child"). We note this information could be used to benefit a parent in evidencing compliance and progress (as Mother attempted to do here at trial via the case plans issued in the prior 2016 cases) or work against the parent by demonstrating a long-term course of conduct of noncompliance, lack of progress, and instability that supports the need to establish permanency for the children elsewhere (as argued by FCCS in this case).

{¶ 36} Considering all the above and having assessed the particular arguments of each party, we conclude in this case: the trial court did not err in determining the current complaint for dependency and permanent custody was not barred by its prior denial of permanent custody in the dismissed 2016 cases; and the trial court did not err in admitting and basing its determinations, in part, on testimony concerning the family's history with FCCS, including the events and circumstances surrounding the 2016 cases, and orders from those cases.

{¶ 37} Accordingly, Mother's first assignment of error, Father's first assignment of error, and the children's first and second assignments of error are overruled.

### B. The Trial Court's Findings Under R.C. 2151.414(E) and the Lack of A New Case Plan

{¶ 38} As provided in the legal framework explained above, in considering a complaint requesting the disposition of permanent custody, a juvenile court must determine, in accordance with R.C. 2151.414(E), whether clear and convincing evidence shows "the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent."  R.C. 2151.353(A)(4); *In re H.H.*, 2019-Ohio-4953, at ¶ 47, 65.  In this case, the trial court found R.C. 2151.414(E)(1) and (4) were met. Those provisions state in pertinent part:

> In determining * * * for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence.  If the court determines, by clear and convincing evidence, * * * for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.  In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> * * *
>
> (4)  The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

R.C. 2151.414(E). "A trial court may base its decision that a child cannot or should not be placed with either parent within a reasonable time upon the existence of any one of the above factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time." *In re Lilley*, 4th Dist. No. 04CA22, 2004-Ohio-6156, ¶ 28.

{¶ 39} Mother argues the trial court's findings under R.C. 2151.414(E) were in error since she has "largely remedied the conditions causing removal and demonstrated a commitment to the children through consistent visitation and the maintenance of a strong bond" with the children. (Mother's Brief at 39.) We disagree.

{¶ 40} First, the trial court's finding that both parents have demonstrated a lack of commitment toward the children is supported by competent, credible evidence. Mother believes she demonstrated commitment to the children by regularly visiting and communicating with the children, maintaining a strong bond with them, and making progress on her case plans. Regarding the case plans, Mother asserts that after the children were removed, she completed a parenting class and "worked on her drug issue" through multiple providers. (Mother's Brief at 43.) She notes the trial court's prior denial of permanent custody and her progress since that time: even with COVID-19 related challenges, such as being laid off, she has "found a way to maintain an income[,] stay in the same house," and maintain her visits and bond with the children. (Mother's Brief at 43.) Father adds that Mother "substantially complied" with the prior case plans. (Father's Brief at 16.)

{¶ 41} Mother's contentions about her consistently visiting and communicating with the children and maintaining bonds with them is not in dispute. The caseworker and the GAL confirmed her account in this regard. Whether Mother completed a parenting class is questionable: she testified to completing the parenting class but did not provide a certificate or other proof of compliance to her caseworker.

{¶ 42} More importantly, however, is that Mother's assertions of her demonstrated commitment to the children avoid the main concerns of the trial court, namely: her actions showing an unwillingness to provide an adequate permanent home for the children. Mother has not demonstrated her ability to independently maintain stable housing or remove drug-related concerns from her home. Mother did show that, after years of living

"back and forth" between hotels and an eviction from an apartment, she had been in the same home for over one year (March 2019 through disposition hearing in August 2020). (July 16, 2020 Tr. at 76.)  However, Mother was not the source of the money to pay the rent. A year's worth of rent was paid by a trust fund set up for Father; Mother is unemployed and receives approximately $192 per week in unemployment benefits (stimulus money briefly provided her with $600 more).  By the time of the disposition hearing, Mother was $2,462 behind in rent and, in the trial court's view, did not provide a credible plan to remedy that situation.    She  testified,  according  to  the  trial  court  "[i]ncredibly"  and  without documentation, that she had $10,000 in her own bank account but said she is opting not to use that money to secure her housing situation (even though she knew stable housing would be a consideration for her children's custody).  (Decision at 4.)  She also told the court she would be "current" on her lease after she brought a check from the trust to the landlord that day but did not have the check with her.  (Aug. 27, 2020 Tr. at 150.)  Mother said she had the option of using trust money to secure the lease through the end of the year and believes she has "the ability to stay stable for at least the end of [2020]."  (Aug. 27, 2020 Tr. at 197.)  The trial court judge ultimately "discounted any testimony by Mother" concerning her  ability  to  maintain  stable  housing.    (Decision  at  4.)    The  GAL  and  caseworker additionally  testified  to  their  concerns  for  Mother's  current  housing  situation  being sustainable: as soon as the trust fund rent was finished, Mother fell behind on rent, which is consistent with her pattern of not being able to provide stable housing in the past.

{¶ 43}  Beyond the financial concerns for Mother's ability to provide housing, the record shows instability and safety concerns related to the people Mother allows access to the home, including Father and her brother-in-law and sister-in-law.  Record evidence overwhelmingly shows Father has an unresolved and very serious drug addiction: he admitted  to  being  addicted  to  drugs  since  he  was  15,  was  recommended  but  never completed  inpatient  treatment,  tested  positive  in  May  2019  for  cocaine,  marijuana, amphetamines,  and  buprenorphine,  and  has  refused  to  test  to  support  his  claims  he  is sober, including refusing to screen at the hearings.  Father suffers from seizures which may be in part due to his drug addictions and has told Mother he has tried to kill himself.

{¶ 44}  The trial court found that Father lives at the home and "will continue to do so until they are evicted for nonpayment of rent" and, as such, "[t]he home is not suitable for

the children." (Oct. 13, 2020 Adjudication Findings at 10.) This finding is supported by the record. The caseworker testified she believes Father lives at the home, and their claims of living apart are a ruse to allow the Mother to get the children back. It is undisputed that Father receives his mail at the home and keeps his belongings there. Mother says she sees him "[a]lmost every day" to eat and do laundry, and he stays (overnight) at her house "maybe once a week." (Aug 27, 2020 Tr. at 211.) She admits this arrangement has been going on since she got the house even though it violated the May 6, 2019 court order, and even though, in the trial court judge's words, she was "told on numerous occasions that if [she] wanted to get custody of the children returned to [her], [she was] going to have to be completely separate from her husband." (Aug. 27, 2020 Tr. at 238.) Mother further testified the judge was "absolutely correct" that she was more involved with Father than before, that she loves Father, that she is his caretaker, that she "would never keep [the children] away from him," and would not rule out him living with her. (Aug. 27, 2020 Tr. at 216, 239.)

{¶ 45} Mother also has not effectively set boundaries with her brother-in-law and sister-in-law, who also are addicted to drugs. The sister-in-law lived with Mother at the house for three months before Mother made her leave because the caseworker saw her there, and the court order said she could not be in the home. Mother testified her brother-in-law would "come and go" from the house and would also break into her house and steal from her. (July 16, 2020 Tr. at 114; Aug 27, 2020 Tr. at 201-07.) In one instance, her in-laws broke the front door window, opened the door, and "stole everything that they could get their hands on." (Aug. 27, 2020 Tr. at 201-02.) The caseworker testified at an unannounced August 2020 home visit, Mother and Father did not come to the door, but she observed a front bedroom window that was completely missing glass, and she smelled marijuana coming from the window. Mother later blamed her brother-in-law, who she said was frequently breaking into the home. Mother also blames her in-laws for introducing Father to "meth," which led to at least one argument at Mother's house where she "basically [got] physical with the sister-in-law because they were using meth and giving it to [Father]." (Aug. 27, 2020 Tr. at 214-15.) Despite these issues, Mother was unclear about whether she ever filed charges against her in-laws and then asked her brother-in-law to assist her in

moving furniture from storage to the house in advance of the instant permanent custody hearing.

{¶ 46} Mother's stance on her own history of drug use also caused the caseworker concern. While Mother tested negative on a drug screen administered the day of the adjudication hearing, Mother admitted to using more Xanax than prescribed in the past (2016), using marijuana approximately one year before the hearing, being put on two suboxone programs by health practitioners, and not following the latest recommendation of her doctor to take suboxone. Despite this history, Mother does not think she currently has a drug or alcohol issue and believes she has never had a drug or alcohol issue in the past. (Aug. 27, 2020 Tr. at 183, 188, 226.) She blames FCCS for removing her kids and a parent mentor for her prior issue with Xanax. Furthermore, while recognizing she needs help with her mental health due to the "damage from losing [her] kids" (she also was diagnosed prior to having kids with "Bipolar and Manic Depression"), Mother has not been proactive in getting that help leading up to the custody hearings. (Aug. 27, 2020 Tr. at 178.) At the time of the hearing, Mother was not on medication to treat her mental health issues, last attended counseling other than with her pastor in 2018, and had a mental health assessment scheduled after the custody proceedings.

{¶ 47} Furthermore, even though Mother moved into the home in March 2019, she had not yet readied the home to accommodate seven children when the dispositional hearing arrived in August 2020. Mother testified she had removed the stacked clutter in the bedrooms the caseworker described as "hoarding" and "physical hazards," and there are now four beds and most of the dressers available for the kids in the three bedroom home. (July 22, 2020 Tr. at 92.) The remaining beds and dressers remain in a storage unit she describes as being located across the street; Mother does not have a license and had trouble arranging help to move the additional furnishings to the house. Mother's description of the home could not be confirmed by the caseworker since the caseworker's multiple attempts to schedule a visit to the home preceding the custody hearing were unsuccessful.

{¶ 48} Overall, we cannot agree with Mother and Father that they demonstrated commitment to their children when clear and convincing record evidence of their actions showed "an unwillingness to provide an adequate permanent home for the child[ren]." R.C.

2151.414(E)(4). Therefore, we conclude the trial court did not err in finding the children cannot be placed with one of the children's parents within a reasonable time or should not be placed with either parent pursuant to R.C. 2151.414(E). Because we find R.C. 2151.414(E)(4) to be met, we need not review the trial court's finding under R.C. 2151.414(E)(1). *See In re Destiny*, 6th Dist. No. L-08-1147, 2008-Ohio-5292, ¶ 26 ("A proper finding of any one of the R.C. 2151.414(E) factors is sufficient to sustain a conclusion that the children cannot now, or in a reasonable time, be united."); *In re Lilley*, 2004-Ohio-6156, at ¶ 28 ("The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time.").

{¶ 49} In an argument relevant to the issue of the trial court's findings under R.C. 2151.414(E), Father essentially contends the trial court erred in finding the children could not be returned to Mother's custody within a reasonable amount of time since no court-ordered reunification case plan exists under the current case number. According to Father, "[w]ithout such a template, neither parent knows exactly what they are required to do to regain custody of their children," and the trial court erred in failing to allow the parents the "usual amount of time under statutory law to complete a reunification case plan." (Father's Brief at 17, 19.) Father believes the facts of the instant case are in line with *In re Smart*, 21 Ohio App.3d 31 (10th Dist.1984), where this court reversed permanent custody of a child in favor of an agency and remanded the matter for the trial court to modify its order to a temporary court commitment with a reunification plan. The children join Father's argument in their reply brief, arguing that because the former cases were dismissed, a new case plan had to be approved by the trial court; the children assert the parents "were not afforded an opportunity to even begin working on the new case plan before their rights were terminated." (Children's Reply Brief at 5.) Mother touches on this issue when pointing out that no court-ordered case plan was in place for the 2020 case, and the children were adjudicated dependent one month before the permanent custody trial. This argument is made, however, in the context of her contention that "[i]f this Court were only to look at 2020, there would be no justification for terminating parental rights." (Mother's Brief at 39.)

{¶ 50} Initially, we note that appellants do not argue that FCCS erred by using the procedure of requesting permanent custody pursuant to R.C. 2151.353(A)(4) in this case

and, as described in the fourth issue below, Mother, Father, and children advocate for alternative dispositions that are (arguably) only available because FCCS filed a new complaint.

{¶ 51} Furthermore, we disagree with Father and children that the lack of a court-ordered reunification case plan under this case number requires reversal here. In the case sub judice, FCCS filed a complaint for dependency also requesting a disposition of permanent custody pursuant to R.C. 2151.353(A)(4). Ohio appellate courts facing this issue have found that a trial court is generally not obligated to order a case plan where an agency in its complaint seeks permanent custody pursuant to R.C. 2151.353(A)(4). *See In re A.R.*, 8th Dist. No. 109482, 2020-Ohio-5005, ¶ 31 (stating R.C. 2151.412 does not require that a court order a reunification plan when it makes disposition pursuant to R.C. 2151.353(A)(4)); *In re B.S.*, 2018-Ohio-4645, at ¶ 62 (noting that district has held that a reunification case plan is not generally required in the context of a complaint for permanent custody); *In re S.S.*, 6th Dist. No. L-16-1234, 2017-Ohio-4474, ¶ 83 (finding that because the agency proceeded pursuant to R.C. 2151.353(A)(4), it did not have to prepare a case plan for the parent); *In re M.C.*, 12th Dist. No. CA2004-04-008, 2004-Ohio-4782, ¶ 29 (holding the trial court did not err by not requiring a reunification plan to be filed and implemented since it was determining a disposition pursuant to R.C. 2151.353(A)(4)).

{¶ 52} Regardless, we do not find appellants were prejudiced by the lack of a formally ordered case plan under the new case number here. Contrary to Father's position, the testimonies of Mother and Father showed they were fully aware that, to reunite with their children, they needed to remedy the conditions that led to their removal, needed to follow the previous case plans prior to the March 9, 2020 dismissals, and understood they needed to follow other court orders, including the March 3, 2020 orders under the new case number. As previously discussed, the trial court in this case was not limited to considerations of just current case plans but appropriately considered "all relevant evidence," including the parents' compliance or noncompliance with the previous case plans and orders in addition to new orders issued under the instant case number. R.C. 2151.414(E). As provided above, when all relevant evidence is considered, the trial court's finding that R.C. 2151.414(E)(4) is met is not against the manifest weight of the evidence.

{¶ 53} Finally, contrary to Father's position, we find *In re Smart* distinguishable. In that case, a mother voluntarily signed papers granting temporary custody of her newborn child to an agency. Because the whereabouts of the father were unknown, the agency could not seek permanent custody at that time. About six months later, the mother sought to regain custody of her child, who was still in foster care. In that interim period, the agency neither took further steps to seek permanent custody nor took steps to reunite the child with the mother. After their first attempt to adjudicate the child dependent failed, the agency filed a second complaint seeking a permanent commitment, and the trial court found the child to be a dependent minor and ordered permanent custody to the agency.

{¶ 54} On appeal of that order, this court, in relevant part, first found that "failure by [the agency] to file a comprehensive reunification plan does not bar its action for immediate permanent commitment under R.C. 2151.353(A)(4)." *In re Smart*, 21 Ohio App.3d at 35. However, we then found that:

> Even though a juvenile court does have the alternative immediately to grant permanent custody to an appropriate state agency upon determination that a child is abused, neglected or dependent under R.C. 2151.353(A)(4), permanent custody should only be granted at the initial disposition hearing under extreme situations where reunification is not possible. Specifically, a court cannot reach the determination under R.C. 2151.353(A)(4) that "the child will continue to be a child without adequate parental care if a reunification plan were prepared" where there has been no good faith effort to reunite the child with his parents or evidence that such an effort to reunite would be futile.

*Id.* Therefore, this court reversed the trial court order and, in doing so, emphasized the fact that the visitations set up by the agency demonstrated a lack of good faith and that the agency social worker admitted the agency had never made a serious attempt to reunite the child with her natural mother. We remanded the cause "with instructions to modify its dispositional order to provide for temporary commitment and a reasonable reunification plan." *Id.* at 36.

{¶ 55} The instant case is easily distinguishable from *In re Smart*. We first note that *In re Smart* was decided under the former language of R.C. 2151.353(A)(4) and under a "good faith" standard that was later superseded by statute. *See In re Stephens*, 12th Dist. No. CA91-05-077 (Aug. 24, 1992), fn. 2 (noting the relevant portions of R.C. Chapter 2151

were amended effective January 1, 1989). Moreover, unlike in *In re Smart*—a case in which the parent never got a chance to prove herself—even after over four years of agency efforts to reunify the children with the parents, including case plans and orders under previous case numbers and an order under the new case number, the parents in this case have not implemented (and continue to reject) actions that would provide an adequate permanent home for the children. Compared to the situation in *In re Smart* at 35, this case has reached an "extreme" where record evidence shows that the children cannot be placed with either of the parents "within a reasonable time or should not be placed with either parent." R.C. 2151.353(A)(4), citing R.C. 2151.414(E). Considering all the above, Father's argument regarding *In re Smart* lacks merit.

{¶ 56} Accordingly, Father's second and third assignments of error are overruled. To the extent Mother's second assignment of error and each of the children's assignments of error incorporate this issue, those assignments of error are overruled.

## C. Best Interest of Child

{¶ 57} A juvenile court considering an agency's request for permanent custody as part of its original abuse, neglect, or dependency complaint must also determine whether permanent custody is in the child's best interest pursuant to R.C. 2151.414(D)(1). R.C. 2151.353(A)(4); *In re H.H.*, 2019-Ohio-4953, at ¶ 47, 71. In determining the best interest of a child for the purposes of R.C. 2151.353(A)(4), "the court shall consider all relevant factors, including, but not limited to":

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 58} In this case, Mother and children initially assert that when the "improper[]" evidence and filings from the prior case numbers are removed from consideration, no basis supports the award of permanent custody. (Mother's Brief at ii, 38.) We have already concluded, contrary to appellants' position, the evidence and filings pertaining to the 2016 cases were properly considered by the trial court. Therefore, the premise of this argument lacks merits.

{¶ 59} Mother also argues it is not in the best interest of the children to grant permanent custody to FCCS for the purposes of adoption where, "mother has maintained stable housing and demonstrated sobriety, the family unit is strongly bonded, and the children all wish to be returned to their parents." (Mother's Brief at ii, 44.) Children make similar assertions in their third assignment of error.

{¶ 60} Specifically, Mother believes that under R.C. 2151.414(D)(1)(a) and (b), the interactions of the children with their parents and the children's wishes to return to their parents should carry "immense weight," particularly considering the strong bonds the parents maintained with the children over four years of being separated. (Mother's Brief at 45.) The trial court found that the children were "very bonded" with their parents and each other and that their interactions were appropriate. (Oct. 13, 2020 Adjudicatory Hearing Findings at 15.) These findings are supported by the testimony of the caseworker and the GAL. However, "resolution of [R.C. 2151.414(D)(1)(a)] is not limited to merely the bond between child and parent." *In re K.R.*, 10th Dist. No. 18AP-633, 2019-Ohio-2192, ¶ 81. Here, the trial court also noted testimony the children were bonded, but to a lesser extent, with the foster parents and found no evidence the children could not bond with other caregivers in a home setting.

{¶ 61} As to the wishes of the children, the trial court acknowledged the children generally wished to be returned to their parents but noted the oldest child felt that by returning home she could help her Mother care for her Father and siblings, that one of the children expressed a desire to stay in their current school district and was under the impression her parents would try to move there, and that the youngest children were not very communicative. The trial court also noted the caseworker and GAL, even while acknowledging the bonds and wishes of the children, ultimately recommended permanent custody be granted to FCCS.

{¶ 62} In terms of the need for a legally secure placement under R.C. 2151.414(D)(1)(d), Mother argues she has established a stable home with adequate bedding and clothing for the children and states she is able to provide financially for the children by "utilizing multiple resources" and actively seeking employment. (Mother's Brief at 46.) Mother notes the children are older now and more capable of caring for themselves, and the older children are "offering to assist with the younger children and already looking for jobs." (Mother's Brief at 46.) Similarly, the children argue Mother has had stable housing for over one year, is current in rent and no longer relies on Father's trust fund, has $10,000 in the bank, could ready her home for the children in a day, has tested "clean" for drugs, and could monitor Father around the children. (Children's Brief at 20.)

{¶ 63} For the many reasons we previously detailed in relation to the trial court's findings under R.C. 2151.419(E), we disagree. First, the trial court discounted any testimony by Mother regarding her ability to maintain stable housing and often found her testimony to lack credibility both in terms of her finances and her assertions that Father does not live in the home. The trial court was in the best position to view Mother as a witness, and we defer to the trial court in this respect as the trier of fact. *In re T.M.*, 10th Dist. No. 18AP-943, 2020-Ohio-815, ¶ 10 (stating the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact since they may observe their demeanor, voice inflections, and gestures).

{¶ 64} Moreover, our review of the record supports a determination under R.C. 2151.414(D)(1)(d) that the children have a pressing need for a legally secure permanent placement and that such a placement cannot be achieved without a grant of permanent custody to FCCS. First, the total length of time involved in this case strongly supports the children's need for a legally secure permanent placement at this juncture. The trial court found that "after over four years of waiting for permanency, the Children must not be left waiting any longer for Parents to address the needs that caused the Children to be placed in the Agency's temporary custody." (Decision at 7.) We note that Mother does not dispute that R.C. 2151.414(D)(1)(c), the custodial history of the children, weighs in favor of granting permanent custody to FCCS. We agree with the trial court and find the children, who were removed from their parent's home in April 2016, have a vital need for a legally secure permanent placement at this time.

{¶ 65} Second, the trial court's finding that permanency cannot be achieved without a grant of permanent custody to FCCS is supported by the record. Initially, we point out that " 'a court is not limited to considering only current compliance with case plan objectives related to housing and income in its analysis of the child's need for a legally secure, permanent placement.' " *In re M.W.*, 2020-Ohio-5199, at ¶ 40, quoting *In re K.R.*, 2019-Ohio-2192, at ¶ 87. *See In re K.Z.*, 4th Dist. No. 19CA22, 2020-Ohio-1013, ¶ 76 (observing that "[e]ven if at times the parents lived in a stable home, they were unable to maintain a stable home throughout the case"); *In re T.M.* at ¶ 25 (holding that all the "positive actions" mother took with respect to her case plan were "in vain given her inability to provide a safe and stable home for the children").

{¶ 66} The record does not show, as Mother and children argue, that Mother has established a stable home with adequate provisions for the children, that she is financially stable, and that she has demonstrated her sobriety. Mother admits that "father may still have a drug problem" but does not argue on appeal that Father will be kept away from the children. (Mother's Brief at 42.) Rather, she thinks the older children, who are aware of Father's drug problem, will simply be able to "watch for that." (Mother's Brief at 47.) Contrary to Mother's assertion, the record demonstrates Father is addicted to drugs and his addiction is of a very serious nature. He admitted to being addicted to drugs since he was 15, was recommended but never completed inpatient treatment, tested positive in May 2019 for cocaine, marijuana, amphetamines, and buprenorphine, and has refused to submit to drug screens to support his claims he is sober. The trial court concluded Father lived at the home despite Mother's contentions otherwise. Mother admitted to allowing Father frequent access to the home, including staying there on a weekly basis. She is his caretaker. Mother testified she would never keep the children away from Father, would not rule out Father living with her in the future, and did not believe she needed to monitor the children with Father closely but, rather, she could just watch Father for signs he was using drugs and have the children report back to her on his behavior. She testified she was "never worried" about Father's drug use around the children or Father "being [inebriated] to the point that he couldn't parent." (Aug. 27, 2020 Tr. at 236, 237.) Mother was worried about the children being alone with Father if he had a seizure.

{¶ 67} Mother also testified to her brother-in-law and sister-in-law being addicted to drugs, breaking into the home, stealing from the home, and being a negative influence on Father. Furthermore, while Mother claims she set up some of the children's beds and dressers and resolved physical hazards in the home—the bedrooms were packed with clutter to the point the door could hardly open—she delayed appointments repeatedly, and the caseworker could not confirm the home was safe and had provisions suitable for seven children to return there. In other words, despite living in the home for over one year, Mother was unable to establish its suitability for the children. Mother also did not demonstrate that the year of stable housing was something she could sustain herself. She did not pay the rent for the home from her own funds, was over $2,000 behind in rent at the time of the dependency hearing, and was unemployed. Mother testified to applying to several jobs but did not know the status of those attempts; her previous job at a restaurant accommodated her admitted tendency to be late by allowing her a one-hour buffer on arrival time. Mother does not have a license and blamed her tardiness on public transportation. Mother is concerned about her own mental health but was not in treatment at the time of the dependency hearing, and did not believe she ever had an issue with drugs despite admitting to using more Xanax than prescribed in the past, using marijuana approximately one year before the hearing, being put on two suboxone programs by health practitioners, and not following the latest recommendation of her doctor to take suboxone.

{¶ 68} Mother and children believe there is no other real possibility of placing the children together due to the size of the group and the "reluctan[ce]" of the foster parents. (Mother's Brief at 46.) However, "although 'the likelihood that a child will be adopted may be considered in determining the child's best interest,' the statutory provisions 'governing permanent custody simply do not require an agency to prove that adoption is likely.' " *In re K.R.*, 2019-Ohio-2192, at ¶ 91, quoting *In re V.B.-S.*, 10th Dist. No. 13AP-478, 2013-Ohio-5448, ¶ 51. In this case, adoption by the foster family is still possible, and it's undisputed the children are doing well in the foster home and in their new school district, where some of the children take advantage of extracurricular activities. The caseworker testified the children love school and are bonded to the foster parents, and the foster parents love the children, want to be able to keep them together, and were still considering adopting the children. Furthermore, the caseworker testified that should adoption by the current foster

family not come to fruition, in her opinion, the children are adoptable as a group: she had transferred to the agency's adoption department and has specifically seen adoptive parents who indicate a willingness to adopt groups of their size.  There is no evidence the group is "likely" to be separated from each other, as Mother contends, or the group "would likely remain in limbo," as the children contend.  (Mother's Brief at 47; Children's Brief at 22.)

{¶ 69}  The "overriding concern" in any child custody case is to reach a disposition that is in the child's best interests.  *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist.1996).  In this case, while the children are bonded with the parents and they desire to return to their parents' custody, the children need a legally secure permanent placement, and this record clearly shows that such a placement cannot be achieved without a grant of permanent custody to FCCS.  After our review of the case at bar, we believe that ample competent and credible evidence supports the trial court's decision that it is in the best interest of the children pursuant to R.C. 2151.414(D)(1) to award permanent custody of the children to FCCS for purposes of adoption.

{¶ 70}  Accordingly, Mother's second assignment of error and the children's third assignment of error are overruled to the extent they challenge the trial court's best interest of the child determination.

### D. Whether the Trial Court Was Obliged to Consider and Make Findings of Fact on Options Other Than Granting Permanent Custody to FCCS

{¶ 71}  The children contend since FCCS filed a new complaint, the trial court had every dispositional option open under R.C. 2151.353, and the trial court "first should have considered granting legal custody to the mother" on the facts of this case or, "[a]t the very least, * * * ordered a [temporary court commitment, hereinafter "TCC"] to the agency." (Children's Brief at 20, 21.)  The children argue permanent custody to FCCS would create less of a sense of permanency than other dispositional options.  Father argues the trial court erred in failing to make a finding of fact that "other dispositional alternatives would be considered, and if rejected, explain why."  (Father's Brief at 20.)  "At a minimum," he asks this court to reverse and remand the case to the trial court to make such findings of fact. (Father's Brief at 21.)  Mother similarly states "the trial court never considered other types of legally secure placements," such as maintaining the children in temporary custody or returning the children to Mother's custody with agency supervision to allow FCCS to

monitor how the family "functions and to see if the parents can actually get the children to school."  (Mother's Brief at 46, 47.)

{¶ 72}  First, contrary to appellants' position, the trial court did expressly consider alternative dispositions: the trial court in its decision framed the issue before it as "to wit: Should the Court grant the Agency permanent custody *or an alternative disposition allowed by R.C. 2151.353?* "  (Emphasis added.)  (Oct. 13. 2020 Decision at 4.)

{¶ 73}  Second, Father's argument that the trial court failed to make promised, specific findings is both against the record and unsupported by law.  Father appears to argue reversible error occurred because the trial court went back on what Father frames as a promise to "make a finding of fact concerning the available dispositional alternatives available * * * and explain why he had not chosen" an alternative disposition.  (Father's Brief at 20.)  Our review of the record cited by Father shows the trial court did not make that promise.  Instead, the trial court promised to "consider" two alternative dispositions offered by the children (temporary custody to FCCS or custody to Mother with supervision) and to render a legal conclusion in its decision "[i]f the Court feels legally constrained in doing a TCC to the Agency" and/or "[i]f the Court feels that it does not have the jurisdictional or legal authority to do a TCC to the Agency on this new filing."  (Aug 27, 2020 Tr. at 279, 282.)  There is no indication the trial court felt legally (or jurisdictionally) constrained from ordering a TCC; rather, the trial court found a permanent court commitment was warranted in this case.

{¶ 74}  Moreover, Father does not cite any legal authority requiring the trial court to make findings or "explain why" alternative dispositions available under R.C. 2151.353(A) were rejected.  (Father's Brief at 20.)  " 'It is the duty of the appellant, not the appellate court, to construct the legal arguments necessary to support the appellant's assignments of error.' "  *Cook v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-852, 2015-Ohio-4966, ¶ 40, quoting *Bond v. Canal Winchester*, 10th Dist. No. 07AP-556, 2008-Ohio-945, ¶ 16, citing *Whitehall v. Ruckman*, 10th Dist. No. 07AP-445, 2007-Ohio-6780, ¶ 2.  *See also Young v. Locke*, 10th Dist. No. 13AP-608, 2014-Ohio-2500, ¶ 16 ("App.R. 16(A)(7) requires that an appellate brief contain an argument in support of each assignment of error presented for review with citations to the authorities, statutes, and parts of the record on

which appellant relies.").  Therefore, Father has not demonstrated the trial court erred in this respect.

{¶ 75} Lastly, R.C. 2151.353 provides that when a child is adjudicated dependent, the court *may* make one of several orders.  R.C. 2151.353(A).  "R.C. 2151.353 is discretionary in that it gives the trial court several options when dealing with children adjudicated as abused, neglected or dependent."  *In re I.M.*, 8th Dist. No. 82669, 2003-Ohio-7069, ¶ 46. "[C]hildren do *not* first have to be put into a particular environment before a court can determine that that environment is unhealthy or unsafe."   (Emphasis sic; citations omitted.)  *In re H.H.*, 2019-Ohio-4953, at ¶ 62.  *See also In re Lilley*, 2004-Ohio-6156, at ¶ 33-35, quoting *In re Bishop*, 36 Ohio App.3d 123, 126 (5th Dist.1987) (internal quotation omitted) (" '[A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability.  To anticipate the future, however, is at most, a difficult basis for a judicial determination.  The child's present condition and environment is the subject for decision * * *.  The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.' ").

{¶ 76} In this case, the trial court exercised its discretion in finding it is in the children's best interest to award permanent custody to FCCS for purposes of adoption in accordance with R.C. 2151.353(A)(4).  As provided in the second and third issues, above, that determination is supported by the manifest weight of the evidence, and appellants have not demonstrated the trial court erred in failing to order an alternative disposition in this case.  *See In re I.M.* at ¶ 38-47 (rejecting mother's argument that the trial court erred in not ordering an alternative disposition to permanent custody); *Miller v. Johnson & Angelo*, 10th Dist. No. 01AP-1210, 2002-Ohio-3681, ¶ 2 ("The burden of affirmatively demonstrating error on appeal rests with the [appellant].").

{¶ 77} Accordingly, we overrule Father's fourth assignment of error and the children's third assignment of error.  Mother's second assignment of error is overruled to the extent it incorporates this issue.  (*See* Mother's Brief at 46.)

**V.  CONCLUSION**

{¶ 78} Having addressed and overruled Mother's two assignments of error, Father's four assignments of error, and the children's three assignments of error, we affirm the

judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

_____